**UNITED STATES ex rel. MARCUS et al. v. HESS et al.**

No. 7841.

Circuit Court of Appeals, Third Circuit.

Argued March 2, 1942.

Decided March 23, 1942.

As Amended March 26, 1942.

William H. Eckert and Eugene B. Strassburger, both of Pittsburgh, Pa. (J. Vincent Burke, Jr., Joseph A. Beck, Ben Paul Brasley, Peter Cooper, John J. Dougherty, A. S. Fingold, Zeno Fritz, Elder W. Marshall, James P. McArdle, Thomas D. McCloskey, John B. Nicklas, Jr., Carl D. Smith, W. W. Stoner, Ferdinand T. Weil, Gifford K. Wright, Emory R. Kyle and Smith, Buchanan & Ingersoll, all of Pittsburgh, Pa., on the brief), for appellants.

Thurman Arnold, of Washington, D. C., for the United States.

Charles J. Margiotti, Pittsburgh, Pa. (Margiotti, Pugliese & Casey, Joseph H. Reich, Joseph A. Rossi, on the brief), for appellees.

Before CLARK, JONES, and GOODRICH, Circuit Judges.

234

CLARK, Circuit Judge.

We share appellees' righteous indignation at the conduct of the appellants. In fact their own counsel made no attempt in his argument to us to justify that conduct. We cannot, however, share appellees' views of the applicable statute. The facts are not in dispute and may be simply stated. Federal funds were granted under the Public Works Administration to local municipalities and school districts in Allegheny County, Pennsylvania to be expended in public-works projects. The appellants, the officers and members of the Electrical Contractors Association of Pittsburgh, conspired to rig the bidding on these projects. The pattern of the collusion was the informal and private averaging of the prospective bid which might have been submitted by each appellant. An appellant chosen by the others would then submit a bid for the averaged amount and the others all submitted higher estimates. The government was thereby defrauded in that it was compelled to contribute more for the electric work on the projects than it would have been required to pay had there been free competition in the open market. A verdict against the appellants was had in the sum of $315,100.91, which consisted of $203,100.91 damages (being double the actual damages found by the jury) and $112,000 penalties ($2,000 penalty for each violation of the statute). The defendants' motions for a new trial and judgment non obstante veredicto were refused. These motions were on various grounds. The learned District Judge discussed principally two: the scope of the pertinent statute and the question of double jeopardy. As we think he erred as to the first, it is unnecessary to pass on the others. We may say that we have already given some consideration to the question of civil sanctions and double jeopardy.[1]

The plaintiff-appellee is an informer. In other words he is the "any person" referred to in the statute.[2] The fact that he is manifestly any person does not completely solve his difficulty. He must also establish the relevancy of the statute. In terms it reads: "Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any *claim* upon or against the Government of the United States, or any department or officer thereof, knowing such *claim* to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such *claim*, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, *claim*, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent *claim*." Revised Statutes, § 5438. (Italics ours.)

In the companion section of the Revised Statutes already alluded to,[3] some of the present functions of the Department of Justice were delegated to the people at large. Private persons were empowered to prosecute frauds against the United States through informer actions.[4] Thus any person may sue another who commits "any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight."[5] Section 5438 was repealed in 1909.[6] Since the amendments to its successor[7] were not incorporated into the provision creating liability in informer ac-

---

1 Mauch v. Com'r, 3 Cir., 113 F.2d 555.

2 "* * * * Such suit may be brought and carried on by any person, as well for himself as for the United States; the same shall be at the sole cost and charge of such person, and shall be in the name of the United States, but shall not be withdrawn or discontinued without the consent, in writing, of the judge of the court and the district attorney, first filed in the case, setting forth their reasons for such consent." R.S. § 3491, 31 U.S.C.A. § 232.

3 R.S. § 3491, 31 U.S.C.A. § 232, footnote 2, supra.

4 These provisions were derived from the Act of March 2, 1863, 12 Stat. 696, Chapter 67, repealed by R.S. § 5596. For general discussions on these actions see 23 Am.Juris., Forfeitures and Penalties, § 61; 25 C.J., Fines, Forfeitures and Penalties, § 84.

5 R.S. § 3490, 31 U.S.C.A. § 231.

6 Section 341 of the Act of March 4, 1909, c. 321, known as the Criminal Code of 1909, 35 Stat. 1095, 1153, 1159. An amendment to R.S. § 5438 by the Act of May 30, 1908, c. 235, 35 Stat. 555, is not material to this case.

7 Section 35 of the Criminal Code of 1909, as amended by Act of October 23,

tions, these amendments may not be invoked in qui tam suits.[8]

Qui tam actions have always been regarded with disfavor:

"It is wrong for a free country to allow an informer to seek redress for his own pecuniary advantage in respect of a public wrong in which he has no direct personal interest or concern. A wrong to the State should surely be atoned for by a penalty payable to the State alone. * * * The origin of the practice whereby private persons can exploit the wrongs of others goes back into English history. Penal actions of this sort arose generally because men doubted whether the eyes of the primitive State were sufficiently watchful and its arm sufficiently long to discover and punish offenders. In a few cases of later date the legislature may have distrusted the zeal of the executive. * * *

"The golden age of the informer was the Tudor period. In Sir William Holdsworth's History of English Law[9] reference is made to the long line of sixteenth-century statutes in which the common informer was given the penalties recovered by his energy, and collusive proceedings by friends of culprits were treated as 'covinous' and therefore no bar against a genuine informer's suit. The system gradually provoked resentment among the many who were 'unjustlie vexed and disquieted by common informers' and this class found a powerful champion in the great Sir Edward Coke. In his Third Institute of the Laws of England he describes informers as 'turbidum hominum genus', and as ranking among the 'viperous vermin who endeavored to have eaten out the sides of the church and common-wealth'. By their diligence in setting penal actions on foot they impoverish 'chiefly the poorer sort for malice and private ends'. Coke's influence caused a marked decline in the statutory recognition and encouragement of common informers. Probably the Crown recognized that it paid better to take the penalty for itself. Coke expressed this view in more dignified words: 'The King cannot commit the sword of his justice or the oil of his mercy concerning any penal statute to any subject.'" Hurst, The Common Informer, 147 Contemporary Review 189, 190.

That dislike has been implemented in court decisions for informer statutes have been construed with utmost strictness. Informers wishing to recover under them must adhere to the exact language of the statute.[10]

The statutory language here important authorizes recovery only where the defendants presented a "claim upon or against the Government of the United States, or any department or officer thereof."[11] Plaintiff would have us believe that the statutory words "presents * * * any claim upon or against" are synonymous with "commits a fraud upon". This argument is refuted both by legislative history and by grammar. The Senator in charge of the bill said in introducing it: "This bill has been prepared at the urgent solicitation of the officers who are connected with the administration of the War Department and the Treasury Department. The country, as we know has been full of complaints respecting the frauds and corruptions practiced in obtaining pay from the Government during the present war; and it is said, and earnestly urged upon our attention, that further legislation is pressingly necessary to prevent this great evil. * * *" The Congressional Globe, 37th Cong., 3d Sess., Dec. 1, 1862—March 9, 1863, at p. 952.

That the Honorable Senator from Michigan was guilty of no overstatement is apparent from the histories of the times: "The government was cheated without conscience in its purchases of military supplies. A committee of the War Department in 1862 exposed frauds of $17,000,000 in contracts amounting to $50,000,000.[12] The Michigan legislature formally charged

---

1918, c. 194, 40 Stat. 1015, constitutes 18 U.S.C.A. §§ 80 and 83. Further amendments made by Act of June 18, 1934, c. 587, 48 Stat. 996 and Act of April 4, 1938, c. 69, 52 Stat. 197.

[8] Olson v. Mellon, D.C., 4 F.Supp. 947, affirmed sub nomine U. S. ex rel. Knight v. Mellon, 3 Cir., 71 F.2d 1021; United States ex rel. Kessler v. Mercur Corp., D.C., 13 F.Supp. 742, 743, affirmed, 2 Cir., 83 F.2d 178.

[9] Volume IV, p. 355 et seq.

[10] Ferrett v. Atwill, 8 Fed.Cas. page 1161, No. 4,747. Cf. United States v. Kansas Pac. Ry. Co., 26 Fed.Cas. page 680, No. 15,506; United States v. Shapleigh, 8 Cir., 54 F. 126.

[11] R.S. § 5438, 18 U.S.C.A. § 80.

[12] The report of this committee says: "He cannot be looked upon as a good citizen, entitled to favorable consideration of his claim, who seeks to augment the vast burdens, daily increasing, that are to weigh on the future industry of

that 'traitors in the disguise of patriots have plundered our treasury', and James Russell Lowell, agreeing, asserted, 'Men have striven to make the blood of our martyrs the seed of wealth.' The term, 'shoddy aristocracy', came to signify those who reaped fortunes out of government contracts, particularly from supplying the soldiers with inferior clothing." Hockett, Political and Social Growth of the American People 1492-1865, 759.[13]

"Necessity, haste and carelessness can explain the acceptance of a great many of these contracts and a very great deal of inferior goods. But a large amount of blame must go to a horde of government-paid officials who, either through criminal negligence or criminal collusion, permitted or encouraged this robbing of the government treasury and cruelty to the American soldier * * *. Accused inspectors passed the blame on to those letting the contracts, the latter blamed the contractors, and the contractors in turn contended that they furnished goods according to specification. * * * Such wide publicity was gained by this complicity of public officials in the early contracting business that one of the very first acts of the extra session of Congress in 1861 was to institute an investigation of the existing practices and conditions. * * * The committee discovered an astounding amount of illegal and fraudulent activities, in some instances calling into question the honor or good judgment of men high in political and military councils of the country." 1 Shannon, Organization and Administration of the Union Army, 56-58.[14]

To the word "claim" has been attributed several legal meanings. It is used as an equivalent for "cause of action",[15] "debt",[16] "demand",[17] "existing right"[18] and "unadjudicated obligation".[19] Through them all however runs the sense of something owing from one party to another. The statement of the facts upon which that obligation is asserted to depend may of course be false, but if true would spell out something like an action of assumpsit or debt. It is something quite different to rely on facts which never could give rise to a promise, express or implied, to pay however amply they demonstrate a cheat. The authorities cited by the plaintiff were all cases decided under statutes which used such phrases as "for the purpose of defrauding the United States"[20] and "to defraud the United States".[21]

---

the country, by demands upon the treasury for which nothing has been rendered. * * * Worse than traitors in arms are the men who pretend loyalty to the flag, feast and fatten on the misfortunes of the nation, while patriot blood is crimsoning the plains of the South and bodies of their countrymen are moldering in the dust." Report of the House Committee on Government Contracts, March 3, 1863.

[13] For an account of the frauds in "bounty-jumping" and "pension-grabbing" see Hockett, supra at page 733 and Schlesinger, Political and Social Growth of the American People 1865–1940, p. 111.

[14] One enterpriser bought defective rifles from the government for $17,486 and immediately resold them to a different quartermaster for $109,912. See Josephson, The Robber Barons, 61.

[15] Foust v. Munson S. S. Lines, 299 U.S. 77, 57 S.Ct. 90, 81 L.Ed. 49.

[16] Holden v. Stratton, 191 U.S. 115, 24 S.Ct. 45, 48 L.Ed. 116; Coats v. Arthur, 5 S.D. 274, 58 N.W. 675.

[17] United States v. Rhodes, C.C., 30 F. 431; In re Heim's Estate, 166 Misc. 931, 3 N.Y.S.2d 134.

[18] Supera v. Moreland Sales Corp., 28 Cal.App.2d 517, 82 P.2d 963.

[19] In re Frank's Estate, 154 Misc. 472, 277 N.Y.S. 573.

[20] Criminal Code § 28, 18 U.S.C.A. § 72 (Madden v. United States, 1 Cir., 80 F.2d 672); Criminal Code § 35, 18 U.S.C.A. §§ 80–86 (United States v. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205).

[21] Criminal Code § 37, 18 U.S.C.A. § 88 (United States v. Carlin, D.C., 259 F. 904; Belvin v. United States, 4 Cir., 260 F. 455; Langer v. United States, 8 Cir., 76 F.2d 817; United States v. Harding, 65 App.D.C. 161, 81 F.2d 563). United States v. Bowman, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149; United States v. Mellon, 2 Cir., 96 F.2d 462; United States v. J. Greenbaum & Sons, 2 Cir., 123 F.2d 770 and United States v. Schor, D.C., 13 F.Supp. 399 were brought under a portion of Section 35 of the Criminal Code which provides: "Make * * * any fraudulent or fictitious statement or entry in any matter within the jurisdiction of any department or agency of the United States." Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607 concerned a prosecution under 12 U.S.C.A. § 1467 which provides: "Whoever makes any statement, knowing it to be false, or whoever willfully overvalues any security, for the purpose of influencing in

The plaintiff seeks to come within the statutory words by stressing the fact that the periodical estimates for partial and final payment were presented to an officer of the PWA. This fact does not surmount the requirement that the claim must be one "against the United States Government or a department or officer thereof." The question is not merely to whom is something presented, it is also what is presented. A claim against the United States means "a right to demand money from the United States." [22] The defendants at no time had such a right. The defendants' contracts were exclusively with the local municipalities. Neither the United States of America nor any of its departments, officers or agencies was a party to said contracts. No promise was made by the United States Government nor any department or officer thereof to pay the defendants for their work. Nor was any specific fund prescribed by the defendants' contracts for their payment. Since the local municipalities were the only parties who promised to pay the defendants, the defendants could look solely to this source for payment. Where the local municipalities obtained the funds to pay the contractors was immaterial as between the local municipalities and the defendants. The claims of the defendants then were simply against the local municipalities. Since the defendants had no claim upon or against the United States, this action was not authorized by the informer statutes.

■ We wish to make it quite plain that our decision herein has no bearing whatever on ultimate restitution. In so far as the United States or the municipalities concerned have been defrauded, suit can be brought and the injured made completely whole. Furthermore, any defendants who are guilty can be punished by more than financial penalty—they can be sent to jail.

So much for the appellants—the United States as amicus curiae contends that the plaintiff was without statutory authority to prosecute this action. The government argues that the right of an informer to sue under Section 3491 of the Revised Statutes has been repealed by subsequent congressional enactment. The repeal is alleged to have impliedly occurred as a result of the Reorganization Act of 1933.[23] This Act declares its purpose to be the reduction of governmental expenditures and the increase of governmental efficiency. It of course makes no reference to informer actions. By its provisions the President is empowered to regroup and transfer the functions of any executive agency. Pursuant to his authority the President promulgated an order which reads in part: "The functions of prosecuting in the courts of the United States claims and demands by, and offenses against, the Government of the United States, and of defending claims and demands against the Government, and of supervising the work of the United States attorneys, marshals, and clerks in connection therewith, *now exercised by any agency or officer,* are transferred to the Department of Justice." Executive Order No. 6166, Section 5, June 10, 1933, 5 U.S.C.A. §§ 124–132 note. (Italics ours.)

■ The government contends that the foregoing order confers upon the Department of Justice the duty of prosecuting all claims on behalf of the United States. If this interpretation is accepted, the executive order conflicts with Section 3491 of the Revised Statutes under which the present action was instituted. Since Section 3491 was enacted seventy years prior to the order, it is contended that the earlier statute has been impliedly repealed. A declaration of implied repeal, however, is not a matter which a court will undertake lightly. Courts have never looked upon implied repeals with favor.[24] The presumption is al-

any way the action of the Home Owners' Loan Corporation or the Board."

[22] Hobbs v. McLean, 117 U.S. 567, 575, 6 S.Ct. 870, 873, 29 L.Ed. 940; 7 Words and Phrases, Perm.Ed., 392. See also, United States ex rel. Kessler v. Mercur Corp., D.C., 13 F.Supp. 742, 743, affirmed, 2 Cir., 83 F.2d 178, 181, certiorari denied 299 U.S. 576, 57 S.Ct. 40, 81 L.Ed. 424; United States ex rel. Salzman v. Salant & Salant, D.C., 41 F.Supp. 196; United States ex rel. Gilchrist v. American Cotton Co-operative Ass'n et al. (L. 58-272

S.D.N.Y.) (no opinion for publication). Cf. United States v. Cohn, 270 U.S. 339, 345, 346, 46 S.Ct. 251, 70 L.Ed. 616; Mookini v. United States, 9 Cir., 95 F.2d 960, 961.

[23] Act of March 3, 1933, c. 212, Section 16, 47 Stat. 1517.

[24] United States v. Noce, 268 U.S. 613, 45 S.Ct. 610, 69 L.Ed. 1116; United States v. Greathouse, 166 U.S. 601, 17 S.Ct. 701, 41 L.Ed. 1130; In re Martin, 7 Cir., 75 F.2d 618.

ways against the intention of the legislature to repeal by implication.[25] An English authority has summarized the rule thusly: "Repeal by implication is never to be favoured; and when the repeal is not express, the burden is on those who assert that there is an implied repeal to show that the two statutes cannot stand together." Beal, Cardinal Rules of Legal Interpretation 525.

And our American writers say: "Repeals by implication are not favored. This means that it is the duty of the court to so construe the acts, if possible, that both shall be operative. * * * One statute is not repugnant to another unless they relate to the same subject and are enacted for the same purpose. * * * When there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed." Sutherland, Statutes & Statutory Construction § 247.

"The inconsistency or repugnancy between two statutes necessary to supplant or repeal the earlier one must be more than a mere difference in their terms and provisions. There must be what is often called 'such a positive repugnancy between the provisions of the old and the new statutes that they cannot be reconciled and made stand together.' In other words they must be absolutely repugnant, or irreconcilable." Crawford, Statutory Construction, § 311.[26]

■ Applying this test we find that the executive order is not at all repugnant to or irreconcilable with Revised Statute Section 3491. The subject matter of the presidential decree is the transfer of functions within the executive agencies of the government. It does not by its terms encompass any claims which may be asserted by individuals for the government, as is done in informer actions brought under Revised Statute Section 3491. The words we italicized in the order quoted above make this clear. The order expressly provides that its application is limited to claims prosecuted by some governmental "agency or officer". "Agency or officer" as used in the order is obviously a shortened reference to and is synonymous with the words "executive agency or officer" in the authorizing statute. Plaintiff does not come within the statutory definition of an "executive agency" since it cannot be classified as a "commission, independent establishment, board, bureau, division service or office in the executive branch of the Government." Since the order neither relates to the same subject matter nor was enacted for the same purpose as Revised Statute Section 3491 the Government's thesis of implied repeal is without foundation. Nor is the government's argument bolstered by a reference to the Act of February 10, 1939 which provides: "No suit for the recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Commissioner authorizes or sanctions the proceedings and the Attorney General directs that the suit be commenced." 26 U.S.C.A. Int.Rev.Code, § 3740.

■ This provision is a part of the Internal Revenue Code and relates only to those qui tam actions brought under the revenue laws.[27] It was derived from Revised Statute Section 3214 [28] which existed side by side with the statute under which this action was begun.[29] The two sections of the Revised Statutes are consistent since one refers to informer actions under the revenue laws only and the other to all remaining informer actions. Each therefore is operative.

The judgment of the District Court is reversed and the cause remanded for further proceeding in accordance with this opinion.

---

[25] Bookbinder v. United States, 3 Cir., 287 F. 790.

[26] See also 59 C.J. Statutes § 508; 25 R.C.L. Statutes §§ 168–171; Repeal or Amendment Implied From Later Inconsistent Enactment, 37 Columbia Law Review 292.

[27] See 26 U.S.C.A.Int.Rev.Code, § 3745.

[28] Section 3213 of the Revised Statutes is the provision authorizing qui tam actions in enforcing revenue laws. By its context then section 3214 referred only to revenue enforcement actions.

[29] See Olson v. Mellon, D.C., 4 F.Supp. 947.