UNITED STATES ex rel. WEINSTEIN v. BRESSLER et al.

District Court, S. D. New York.
April 20, 1945.

[1] No opinion for publication.

John F. X. McGohey, U. S. Atty., of New York City (Francis M. Shea, Asst. Atty. Gen., and Joseph M. Friedman, Daniel M. Sandomire, and Lester S. Jayson, Sp. Assts. to Atty. Gen., of counsel), for the United States.

Louis Waldman, of New York City (Louis Waldman and Edward Kurland, both of New York City, of counsel), for defendant. Unions.

LEIBELL, District Judge.

Certain of the defendants, United Hatters, Cap & Millinery Workers International Union and Local No. 2 of the International Union (both hereinafter referred to as "Union"), together with Max Zaritsky, Jacob Roberts and Samuel Deckler, officials of the International Union or Local No. 2, have joined in moving for an order dismissing the complaint on the ground that the complaint fails to state a claim against defendants upon which relief can be granted, or, in the alternative for summary judgment.

The action was brought under what is commonly known as the Informer's Act, 31 U.S.C.A. §§ 231–235. It was instituted on August 26, 1943, by the relator, Albert Weinstein, for himself and for the United States. The statute was amended December 23, 1943, and pursuant to § 232(C), one of the amendments, the United States entered an appearance in the suit on March 4, 1944, and undertook to carry on the suit.

The complaint alleges that between January and November of 1941, the United States War Department circulated "Requests for Informal Bids" for contracts for the manufacture and sale to the Government of an aggregate of 6,000,000 army field hats and caps, "with the intention and purpose that free, unrestricted and competitive bids would be submitted," and that contracts would be awarded to the lowest bidders possessing the proper qualifications. It is further alleged that the defendant manufacturers and labor unions and their officers and others conspired to secretly allocate among themselves the entire quantity of hats and caps required by the Government and "to designate certain manufacturers to bid upon arbitrarily limited quantities of said hats and caps"; "to secretly fix arbitrary, non-competitive, unfair, excessive, identical and fraudulent prices in response to the 'Request for Informal Bids'"; to hinder and prevent the submission of bids by others not in the conspiracy; to deceive and defraud the United States War Department by representing that the collusive, arbitrary, unfair, excessive, non-competitive bids were honest and competitive bids based upon fair and competitive prices and that the manufacturers submitting such bids were rival bidders; to thus secure the award of contracts at the non-competitive, collusive, fraudulent and excessive prices; to obtain and aid in obtaining the payment by the United States War Department of "false, fictitious, fraudulent and excessive claims" based upon the collusive and fraudulent prices fixed by defendants and their co-conspirators; and to restrain interstate trade and commerce in violation of the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note.

The complaint then sets forth how the defendants and their co-conspirators allegedly carried out the aforesaid agreement of conspiracy, so that the bids of the alleged conspirators on the first request for bids (February) were 70¢ per hat, on the second request (June) were 65¢ per hat, and on the third request (September) were 50¢ per hat.

It is also alleged that the United States War Department was defrauded, misled and deceived, by the acts of the defendants and their co-conspirators into the belief that the bids were fairly and competitively submitted and that the prices were fair, reasonable and competitive prices and that the United States, without knowledge of the collusive agreements, awarded contracts to the defendants and their co-conspirators and paid their bills, vouchers and claims for the hats manufactured under the contracts, and that the said bills, claims and vouchers were false and fraudulent by reason of the fixed, fraudulent, non-competitive and excessive prices submitted on the collusive bids. It is also alleged that a fair price at the time of these requests for bids was 45¢ per hat. [The Government furnished the material; the manufacturers made the hats.] The amount of damages alleged is $900,000, which per statute (31 U.S.C.A. § 231) is doubled to $1,800,000, plus specified forfeits.

As appears from the affidavits before the Court, and from the discussion of counsel on the motion, the Government does not contend that there was any fraud in the bidding for or the award of the contract for the 2,000,000 hats and caps in February and for another 2,000,000 in September 1941. The transactions attacked by the Government relate to bids for and the awarding of contracts in June 1941 for about 2,000,000 hats and caps, of which a total of 175,000 were awarded to two of the defendant manufacturers, Bell Cap Company and Ribbon Narrow Fabric Co., Inc.

The Government's affidavits show that contracts for one-half the 2,000,000 hats on which bids were sought in February 1941 were awarded to certain low bidders, other than the defendant manufacturers, at prices between 45¢ and 65¢ (at an average of 55¢); that the defendants and other union shops which had submitted much higher bids agreed with the Government to reduce their prices so that for hats manufactured west of the Mississippi the price would be 65¢, while in the East the price would be 70¢. Thus the one-half of the February contracts which went to low bidders within the range of 45¢ to 65¢ were awarded on bids that admittedly were submitted without any collusion, and the other one-half of the February contracts went to the defendant manufacturers and other union shops at the revised 65¢ and 70¢ prices, under what were in fact negotiated contracts.

The Government's affidavits and briefs also support defendants' contention that there was no collusion in the bids submitted for the September requirement of 2,000,000 hats. The average price paid by the Government in September 1941 was 47¢. The Government intimates that the reason that there was no collusion in the September bidding was because the Department of Justice had started an investigation of the June bidding. But, regardless of the motive, the September bidding was not collusive. In fact there was a great variance in the prices bid.

As to the June bidding, it is clear that the bids submitted by the defendant manufacturers were collusive and that the defendant unions and their officers were active in bringing about the agreement of the manufacturers to submit similar bids of 65¢ per hat and to allocate quantities among themselves. The defendants contend that they thought their plan to bid that price and allocate the quantities met with the approval of at least one of the Government's representatives. That is disputed; but one thing is certain, the Government officials knew of the defendants' plans to submit identical bids of 65¢ before the bids were submitted. It is the Government's position that the defendants were warned that any such conduct would be illegal. But there could not have been the warning without the knowledge. When the bids were submitted Colonel Jones took a firm stand and recommended that all bids of 65¢ per hat be rejected as collusive. In all 46 bids were submitted in June; only 25 of them were at the collusive price of 65¢. The Colonel reported to the Quartermaster General at Washington, as follows:

"In addition to the above, the interview detailed in Exhibit A, established the fact that a group of manufacturers have entered into a collusive arrangement whereby the price to be bid on Government

contracts is fixed. Such collusion constitutes a fraud on the Government, whether it be instigated by a labor union, one of its officials, or by an association of manufacturers, since in any case the bidder has acquiesced in or concurred in this collusive arrangement. The fact that twenty-five of the bids submitted are identical in price (65¢) indicates that the plan outlined by the labor union official was followed in this instance. As the making of an award to any of the Government contractors who were involved in this fraudulent collusion would be condoning of this flagrant violation of the Government's right to purchase in a free and open market, and in view of the fact that this Depot has been put on notice that this collusive plan of bidding is in operation and would thus constitute an approval of this system of price fixing, it is strongly recommended that all twenty-five bids submitted under this invitation at 65¢ be rejected. Further, it is recommended that this situation be brought to the attention of the Department of Justice for appropriate action."

Mr. Jayson, the Special Assistant to the Attorney General, states in his affidavit on this motion:

"It was found, however, that if all of the 65¢ bidders were rejected, the Army would be unable to order all of the two million hats, and because the need for the hats was urgent, it was necessary to include 4 such bidders in the awards, two of whom are defendants in the instant case: Bell Cap Company received an award for 75,000 hats, and Ribbon Narrow Fabric Company received an award for 100,000 hats.

"Representatives of the union and manufacturers whose bids had been rejected thereupon went to Washington and proposed negotiation, offering to lower their bids, and various manufacturers sent telegrams and letters reducing their bids but with the entire authorized quantity already procured, the Government refused."

This present suit thus comes down to a claim that in the June award of contracts the Government was defrauded to the extent of the two contracts above mentioned for 175,000 hats. The motion for summary judgment squarely presents the question whether, taking the facts as set forth in the Government's affidavits, there is any basis for concluding that the Government has a claim under the statute,

31 U.S.C.A. § 231. In deciding that question we must not base the decision on whether or not the defendants' conduct was a violation of the Sherman Anti-Trust Act. That is something that was the subject of an indictment under the Sherman Act in the Federal Court in Philadelphia, which has been disposed of. It might be noted here that the federal grand jury investigated defendants' acts in relation to all three requests for bids, those sent out in February, in June and in September 1941, and found an indictment only in relation to the June bids. Under United States v. Cooper Corporation, 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1072, the United States is not a "person" entitled to sue civilly for treble damages (15 U.S.C.A. § 15) sustained as a result of a defendant's unreasonable restraint of trade in connection with a Government contract.

The present suit is under the Informer's Act, 31 U.S.C.A. § 231, and in order to sustain the suit facts must be shown that the defendants' conduct falls within that statute, which provides:

"§ 231. Liability of persons making false claims

"Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United States, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim, * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs

of suit; and such forfeiture and damages shall be sued for in the same suit. (R.S. §§ 3490, 5438.)"

■ The Circuit Court of Appeals for this Second Circuit discussed the statute in United States ex rel. Brensilber v. Bausch & Lomb Optical Co., 2 Cir., 131 F.2d 545, 546 (later affirmed by the Supreme Court by an equally divided court, 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417) and held that "the statute certainly makes fraud of some sort the basis of the liability, and uses the word in its accepted sense of deceit. * * * deceit is a sine qua non; it will not serve that he secured it by any other kind of wrong." The Court then proceeded to show how in the case of United States ex rel. Marcus v. Hess, 3 Cir., 127 F.2d 233, the successful bidder obtained his contract through a form of deceit, as a result of a conspiracy of a group who so arranged their bids that one of them, personally agreed upon, would get the contract from the P.W.A. In the Hess case the authorities did not know of the conspiracy of the bidders and awarded the Hess contract thinking he was a genuine honest bidder in an open competitive bidding. The Third Circuit denied relief because the contract was awarded by a local authority and not by the United States. The Supreme Court reversed the Third Circuit and held that the Government contributed funds to the P.W.A. which together with local funds were used to pay Hess under the contract, and so the fraud was a fraud on the Government and came under the Informer's Act.

In the Bausch & Lomb case by reason of certain exclusive market or monopoly arrangements with others, who otherwise might have been competitors, Bausch & Lomb was the sole bidder. As the Circuit Court of Appeals remarked: "That was a wrong, but it was not a 'fraud' unless Bausch & Lomb represented at some stage of the negotiations that they had not secured an unlawful monopoly of the market. Plainly a bidder who bids for a contract makes no representation, express or implied, as to the reasons which have led him or enabled him to put in his bid. He does indeed represent that he can perform, but he does not represent that there is an open market, or that his bid is 'normal' or 'reasonable,' or 'competitive.' If he has been guilty of unlawful conduct in eliminating competitors, he can be called

to account as Bausch & Lomb have been, but not because by bidding he has said anything about competition." The two defendants, Bell Cap Co. and Ribbon Narrow Fabrics Co. Inc., made no representation in their bids that the bids were competitive. Indeed, the contrary was known to the Government officials to be the fact.

Among the exhibits, made part of the Zaritsky affidavit and submitted in support of this motion, is a copy of the June proposals, here in issue. Under Exhibit A is a notice to bidders dated June 10, 1941 and signed by Col. Jones. It contains the following heading:

"Amendment No. L.—Request for Informal Bids (Negotiated Contract) No. 669–41–NEG–73—for Mfg. of Hats, Herringbone Twill."

The form of contract annexed is likewise headed "Negotiated Contract." Nowhere in the form is there any specific representation made on the part of a bidder that the bid entered was free, competitive and non-collusive.

The decision in the Bausch & Lomb case, affirmed by the United States Supreme Court, sets forth the law to be applied to the case at bar.

■ There was no deceit in the case at bar because on the admitted facts the Government knew in advance the plan of the defendant manufacturers to submit a uniform price of 65¢. Further, the Government rejected the 65¢ bids, because they were collusive. The exhibits show that all but 365,000 of the 2,000,000 hats went to bidders who bid less than 65¢. The Government explains its award of four contracts at the 65¢ price to four of the alleged 25 collusive bidders, as having been made necessary because the lower bidders could not supply the full requirement of 2,000,000 hats. Assuming that to be the fact, the Government officials were not acting under any misapprehension; they were not deceived; they knew how the 65¢ bid came to be submitted by 25 of the 46 bidders; and with that knowledge they awarded 4 of the 25, contracts for part of the required amount. Where was the fraud? Further, it does not appear that the Government made any effort to have those four reduce the 65¢ bid price. And none of the other 65¢ bidders were asked to reduce their price. Indeed, the Government's affidavits show that when the 65¢ bids were rejected, the collusive bid-

ders "sent telegrams and letters reducing their bids but with the entire authorized quantity already procured, the Government refused." Who was deceived? Applying the language of the Circuit Court of Appeals in the Bausch & Lomb case to the submission of the 25 collusive bids, we may say: The submission of the collusive bids was a wrong, but it was not a fraud unless the 25 bidders represented at some stage of the negotiations that their bids were competitive and not the result of collusion and that the Government was deceived thereby.

Since there was no fraud practiced upon the Government in the inception of the contracts awarded to two of the defendants (Bell Cap Co. and Ribbon Narrow Fabric Co., Inc.) in June 1941, no fraud attached to any claims presented by them for payment of the hats they manufactured at the 65¢ rate. There being no fraud in the claims presented, there is no cause of action based upon the statute in question, 31 U.S.C.A. § 231, and defendants' motion for summary judgment should be granted.

It is unnecessary to discuss the other points made by the moving defendants in support of their motions. Settle order accordingly.