## UNITED STATES v. HARDING et al.

### No. 6511.

United States Court of Appeals for the District of Columbia.

Argued Nov. 4, 1935.

Decided Jan. 6, 1936.

Leslie C. Garnett, U. S. Atty., and John W. Fihelly, Asst. U. S. Atty., both of Washington, D. C.

George P. Hoover, George D. Horning, Jr., Milton W. King, and Bernard I. Nordlinger, all of Washington, D. C., for appellees.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, and GRONER, Associate Justices.

GRONER, Associate Justice.

This is an appeal from a judgment of the Supreme court of the District of Columbia sustaining the demurrers of appellees to an indictment, in one count, in which it was sought to charge the appellees with a conspiracy to defraud the United States, in violation of section 37 of the Criminal Code (18 U.S.C. § 88, 18 U.S.C.A. § 88).

The indictment recites the passage by Congress of an act approved June 16, 1933, referred to as the National Industrial Recovery Act, and sets out the provisions of section 1 of title 1 of the Act (15 U.S.C.A. § 701). The indictment then recites that Congress gave the President power to create an agency to be known as the Federal Emergency Administration of Public Works and to appoint a Federal Administrator, with authority to prepare a comprehensive program of public works. The indictment charges that, pursuant to this authority, the President appointed an Administrator and that there was set up in Washington the headquarters with certain agencies and branches in various states. One such agency and branch was established in the city of Fort Worth, Tex. The adoption of a public works program and of regulations for obtaining grants and loans is alleged, and it is charged that the act gave the Administrator power to accept or reject applications or to make conditions with relation thereto. At the time in question there existed in Texas a state governmental agency described as a conservation and reclamation district known as the Willacy County Water Control and Improvement District No. 1 (we shall call it District)—that the management of its affairs was in a board of directors consisting of five members with authority to issue bonds to the amount of $7,500,000 for the purpose of financing the construction of a system of irrigation; that the District caused plans to be made showing a detailed statement of the materials to be used in the construction; that the work on the project was begun, but was discontinued for lack of funds, and the District then made application to the Public Works Administration in Washington for a loan and grant under the provisions of the National Industrial Recovery Act (48 Stat. 195),

and filed plans and specifications therewith, which plans and specifications provided for the construction of a gravity and open canal system of irrigation; that the District offered as security for the loan the bonds of the District; that on the 8th of December, 1933, the Administrator allocated the sum of $4,853,000 to the purpose of a loan for the District for the construction of the project. The exact amount of the grant of money under the act was to depend upon the cost of labor and materials used on the project, but was to be within the limit of 30 per centum thereof.

The act of Congress required that the contract should be let by means of competitive bidding to the lowest responsible bidder, etc., and otherwise should conform to the provisions of the Recovery Act. The indictment charges that the United States had the right, in passing upon the application and in making the grant, to have its governmental functions administered in a fair and effective manner, to the end that the policies of the Administrator should be secured and effectuated; and that this result depended upon the opinions and recommendations of his subordinates in the Public Works Administration in Washington and in Texas.

The Administrator appointed one of the defendants, Welty, engineer-examiner in Fort Worth, Tex., and the duty of the latter was to pass upon the engineering features of applications and to make recommendations to his superiors. That in April, 1934, the District submitted plans and specifications to Welty, whose duty it was to make recommendations to his superiors, whose duty—in turn—it was to make a recommendation to the Administrator in Washington. That another of the defendants, Olberg, was the engineer-examiner on irrigation projects in Washington, whose duty it was to supervise and pass upon the engineering features of applications and plans and specifications, in connection with applications for loans, and to make proper recommendation to his superiors in Washington. Another of the defendants, Harding, was a director of the District and a dominating factor in its acts. Still another defendant, Hammond, was an officer of the Hammond Lumber Company; another, Cole, vice president of a subsidiary of the Hammond Lumber Company; one Barry, an employee of a subsidiary of the Hammond Lumber Company; and one McElwrath, an individual interested in the ap-

plication of the District for a loan and grant from the Federal Administrator.

The indictment then charges that Harding, Olberg, Welty, Barry, McElwrath, Hammond, and Cole, from April, 1934, to December, 1934, within the District of Columbia, "each then well knowing all the premises aforesaid in this indictment, unlawfully, feloniously, knowingly, and wilfully, did conspire, combine, confederate, and agree together and each with the other and with divers other persons to the grand jurors aforesaid unknown, to defraud the United States of and concerning its properties, rights, and moneys, to wit, of and concerning its right to have the governmental functions set up by the National Industrial Recovery Act administered in a fair and effective manner; of and concerning its right to have the contract for construction of the Willacy County project let by means of competitive bidding; of and concerning its right to have the contract for the construction of the Willacy County project let to the lowest responsible bidder supplying suitable material and workmanship and complying with the provisions of the National Industrial Recovery Act; of and concerning its right freely and fully to contract in the matter of the application of the Willacy County District, for a loan and grant from the Federal Emergency Administrator of Public Works; and of and concerning its right to the faithful, honest, conscientious, unbiased, and unprejudiced services of said Charles R. Olberg as such employee aforesaid of the United States; and further to defraud the United States of large sums of money appropriated by Congress for the administration of the said National Industrial Recovery Act, as will hereinafter be more fully set forth."

The indictment then goes on to allege the plan of the conspiracy. The manner was that the defendants were to cause the drawing and writing and the approval by the Administrator of new plans and specifications which would substitute for the open canal system of irrigation of the previously approved plans, which required the use of small quantity of piping and piping material, a pipe-pressure system of irrigation which required the use of a large quantity of piping material, and to designate for use in piping "redwood" material, and so to close the bidding for the contract for the construction of the project to all bidders except bidders on redwood; that the defendants, and particularly the defendants Hammond, Cole, and Barry, were to cause all persons and corporations manufacturing and producing redwood lumber to agree to place in the name of the Hammond Lumber Company the absolute control of quoting prices of redwood lumber for the project; and that the defendants, and particularly the defendants Hammond, Cole, Barry, and McElwrath, were, in the name of the Hammond Lumber Company or in the name of the defendant McElwrath, or in the name of one or more other persons to the grand jurors unknown, to control the market of redwood lumber by causing all other persons or corporations producing redwood lumber to agree to place its sale exclusively in the Hammond Lumber Company; and the Hammond Lumber Company, in turn, would refuse to quote a reasonable price to all other bidders for the work on the project, so that such other persons or prospective contractors would be unable to bid. Thus the conspirators were to secure to themselves the exclusive right to bid for the work on the project, and thus to secure the making of the award to them; and were arbitrarily and corruptly to fix a bid for the project at a price which would allow the defendants a profit of thirty per centum of the actual cost to them of its performance; and thus to procure a profit of $400,000. That the District was without financial means for constructing the project except through the Administrator; that the plan and scheme was well known to the defendant Olberg, the Washington representative of the Administrator, who was induced to join the conspiracy and who was to enable its successful consummation by failing to give his honest, faithful, and conscientious services to the United States, but instead to corruptly use his influence and power by way of recommendations to his superior, and thus to bring about the approval of the grant and loan to the District for the construction of the project under the plans and specifications substituted by the conspirators, as a result of which the conspirators would be awarded the contract and the provisions for competitive bidding would be rendered of no effect, and the government grant of money would be increased; and he was to receive for his perfidy and disloyalty a position as engineer of the project at a salary of $10,000 per annum, which was greatly in excess of the salary which he then was receiving from the United States—the result of all of which was to deprive the United States of

his "faithful, honest, conscientious, unbiased and unprejudiced services" and to deprive the United States of large sums of money of the funds appropriated by Congress for the administration of the Recovery Act.

The indictment then concludes with a charge of twenty-eight overt acts, in furtherance of the conspiracy, in the District of Columbia and in the state of Texas.

The judge below was of opinion that the indictment charged two conspiracies. The first, he thought, was that of the conspirators other than Olberg, who were to bring about the rejection of the plans which the Administrator had approved, and the substitution of the piping pressure system; and, having accomplished this, then to procure the exclusive right to quote prices on redwood and then, in turn, to quote prices which would result in an unconscionable profit. The second conspiracy, he thought, was that of the defendant Harding in offering to the defendant Olberg a position at nearly double his government salary to induce him to violate·his duties and use his influence to further the plans of the conspirators. He was unable to find in the indictment an agreement between Olberg and the other defendants, and was of opinion that the indictment only charged that the other defendants "were to dangle a bait before him (Olberg) and that the lure would influence him to perform such official actions as the others desired." Hence he sustained the demurrers on the ground that the indictment was duplicitous. He also was of opinion that the indictment, taken as a whole, did not charge an offense under the conspiracy statute.

 We are unable to agree with either of these conclusions. In our view the indictment shows that only one conspiracy is charged. The unlawful agreement alleged, succinctly stated, is this: The Texas irrigation district was incorporated for the purpose of carrying out an irrigation project. When funds for this purpose failed, it applied to the United States, through the Public Works Administrator, for a loan and grant with which to complete the project and submitted plans and specifications which received the approval of the Administrator. After all of this had happened, all seven defendants entered into a common plan to secure a change in the method of completing the project by the substitution of a pipe system, requiring the use of redwood, for an open canal system, to the end that thereby they would receive a large profit from the construction of the work. To carry out this purpose, some of the conspirators were to obtain control of the redwood lumber market so that no one else would be in a position successfully to bid; and Olberg, a governmental officer charged with the responsibility of approval of the plans, was by his recommendations to secure their approval. In this manner the conspirators were to defeat and nullify the provisions of the act of Congress with relation to grants and loans for irrigation projects and to cause the project to cost a very much larger sum —and thus to cause the United States to pay out sums of money under its agreement for the loan and for the grant which it would not otherwise have paid out.

In this view of the indictment, it is obvious that there was but one continuing conspiracy. The different conspirators were to contribute different services to the common purpose, but the conspiracy itself depended upon two major conditions. One was to obtain control of the redwood market and thus to fix the price of that material; the other, to obtain the approval of the United States of the change in the system. Except for success in both respects, the scheme would be abortive. ·And so the indictment charges that some of the conspirators did in fact obtain control of the redwood market and, having secured the contract, were in position to exact an arbitrary profit whenever the Administrator approved the change in plans; and that the obtaining of this approval was undertaken by Olberg who "then and there well knew" of the scheme and of the acts of the conspirators and who, in consideration of a.position with a higher salary, agreed with the other conspirators corruptly to use his influence and power with his superiors in the Public Works Administration to bring about the approval and thus secure a grant and loan for the construction of the project in accordance with the design and plan which formed the basis of the conspiracy. The ultimate object was the securing of the money of the United States.

It is not essential, in charging conspiracy, to show that all of the conspirators participated in the conspiracy at its beginning, nor is it essential that all contribute alike either to the making of the scheme or to its fulfillment. It is enough if at some period during the continuance

of the conspiracy there is a common design and purpose applicable to all the conspirators. Some may join the conspiracy early, some late; but if there is ultimately a common design to obtain or further an illegal purpose, the culpability of all is equal.

And this is true as to all the conspirators, whether they joined the conspiracy at its inception or at a later time. "When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do. * * *" Van Riper v. United States (C.C.A.) 13 F.(2d) 961, 967. See, also, Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 249, 38 S.Ct. 65, 62 L.Ed. 260, L.R.A. 1918C, 497, Ann. Cas. 1918B, 461.

In the instant case, as we think, the indictment charges an original plan, in the successful carrying out of which all the parties had a part to play. The fact that the plan required certain of its details to be worked out in advance of others does not destroy its continuity or affect its criminal character. Except with the participation of Olberg, it was incapable of effect. It is of no consequence, therefore, that some part of the plan was accomplished in advance of his participation. The part then accomplished would have been futile, unless he joined the others. When he joined, the plan was complete; and then there a common purpose and a common understanding existed to commit the unlawful act. To say, therefore, that the offer to Olberg to join the conspiracy and make it effective created a new or separate conspiracy is without warrant. The indictment, as we read it, sets forth only one scheme to defraud. The lower court was, therefore, in error in holding that the indictment was duplicitous.

█ Nor do we think the indictment fails to charge an offense. It charges that the defendants conspired to deprive the United States of the faithful services of an employee and to defraud the government of large sums of money appropriated for the administration of the National Industrial Recovery Act. "It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the govern-

mental intention." Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968. And in Haas v. Henkel, 216 U.S. 462, 479, 30 S.Ct. 249, 54 L.Ed. 569, 17 Ann.Cas. 1112, the Supreme Court, speaking of the conspiracy statute, said it is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful functions of any department of government. If there was collusion and corruption in the plan as set out in the indictment—and it is charged there was—that is sufficient against the demurrer. The United States—as has been said over and over again—is entitled to be protected in its rights, operations, and functions; and when men conspire to impair or defeat them, they commit an offense against the United States. Pan.-Am. Pet. & Transport Co. v. United States, 273 U.S. 456–500, 47 S.Ct. 416, 71 L.Ed. 734.

█ In the argument in this court we were told that the indictment fails to allege facts showing that the rules and regulations were made by the Administrator under proper authority, and that the indictment is likewise defective in that it does not allege facts showing that there was imposed upon Olberg any duty in respect to the District project. A short answer to this is that the indictment is sufficient in both respects.

The indictment specifically alleges that the Administrator, under the power granted him by the President, had authority to and did prepare a comprehensive program of public works to which grants and loans might be made. It likewise charges that it was the duty of Olberg to examine, consider, counsel, supervise, and pass upon the plans and specifications and that his superiors would be guided largely by his recommendation and action on applications; that Olberg was guided and influenced by his personal and pecuniary interests, as the result of the offer to him of employment at a higher salary, and agreed, as his part of the conspiracy, corruptly to recommend to his superiors and to bring about the approval of the common plan—this was sufficient. In a conspiracy case it is not necessary to allege each detail of the plan, and the indictment is not demurrable if it sufficiently apprises the defendant of what he must be prepared to meet and will secure him against danger of being a second time put in jeopardy; and if the defendant wishes further details, the trial

568

court will, on application, require the United States to furnish a bill of particulars. See Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861. See, also, Hyde v. United States, 27 App.D.C. 362, 383.

We were also pressed in argument with the proposition that the act of Congress known as the National Industrial Recovery Act is unconstitutional and void, and therefore that there was no legitimate governmental function which would be impaired, defeated, or obstructed. We answer this point as did the Circuit Court of Appeals in the Eighth Circuit, Langer v. United States, 76 F.(2d) 817, 824, that the gist of the offense charged is conspiracy, and the indictment being properly drawn under the conspiracy statute, the attack on the National Industrial Recovery Act is in the nature of a collateral attack; and the indictment is good as a conspiracy indictment even though the National Recovery Act may be unconstitutional.

This is particularly true here for reasons we have already stated; namely, that the conspiracy charged had, as its ultimate object, the obtaining by the conspirators of funds of the United States which they could not receive and which the United States would not pay out except for the unlawful acts of its own employee in confederation with the other defendants. If the plan had been successful, and if the government had paid out moneys—as a grant or gratuity—in excess of those which it would have paid except for the dishonesty of its employee in confederation with the other defendants, it would hardly be contended the payment was lawful; and this would be equally true whether the President had the right to create the Public Works Administration or whether the appropriation by Congress of moneys to the particular purpose was or was not constitutional.

For these reasons, we think the lower court erred in sustaining the demurrers; and in this view the judgment of the lower court must be reversed and the case remanded for proceedings in accordance with this opinion.

Reversed and remanded.