**UNITED STATES of America**

v.

**Alfred Lee WEINBERG and Morgan Bird, Sr.**

Cr. No. 12058.

United States District Court, M. D. Pennsylvania.

March 4, 1955.

. Isaiah Matlack, Sp. Asst. to Atty. Gen., for the U. S.

Leo White, Wilkes-Barre, Pa., for defendant Weinberg.

J. Julius Levy, Scranton, Pa., Max Rosenn, Wilkes-Barre, Pa., for defendant Bird.

MURPHY, District Judge.

Defendants found guilty by verdict of a jury of conspiracy to defraud the United States, 18 U.S.C.A. § 371, move in arrest of judgment,[1] for judgment of acquittal,[2] and for a new trial. To

---

1. Our review is limited to the indictment, the not guilty plea, and the verdict. United States v. Caplan, D.C., 123 F. Supp. 862 (not the testimony—1671 pages, or the 145 exhibits received during 17 trial days); defendants' motion to dismiss the indictment was denied by order and memorandum opinion. The indictment charged that defendants did "conspire, confederate and agree together and with each other, and with Arthur B. Jenkins, John F. Yekel, and Louis Shaffer, who are named herein as co-conspirators but not indicted, to defraud the United States out of certain monies by fraudulently inflating the cost basis of the tuition rate and by fraudulently inflating and increasing the cost to be charged to the Veterans Administration of furnishing to certain veterans the books, supplies and equipment necessary for the satisfactory pursuit and completion of the course of education and training in which they were enrolled."

2. Objections to denial of previous motions for judgment of acquittal were waived by defendants offering evidence on their own behalf. United States v. Calderon, 348 U.S. 160, 75 S.Ct. 186; United States v. Caplan, supra, 123 F.Supp. at page 866, footnote 7; as to the possibility of bol-

place the problem in its proper setting it will be recalled that the Serviceman's Readjustment Act of 1944[3] authorized a program of education and training for veterans under the supervision of the Administrator of Veterans Affairs and empowered the Administrator to prescribe and promulgate such rules and regulations as may be necessary to carry out its purposes and provisions.[4]

Pursuant thereto pertinent regulations were adopted and published:[5] establishing requirements for contracts with educational institutions; prescribing a method of determining fair and reasonable compensation; requiring institutions under contract to furnish necessary books, supplies and equipment, including tools to eligible enrolled veterans. Preliminary to determination by the Veterans Administration of the rate of tuition, each institution was required to submit a statement of costs, including therein all reasonable and fair expenses,[6] including specifically the cost of consumable instructional supplies, depreciation and reasonable rent actually incurred in providing the instruction. Based thereon the rate of tuition was to be determined by the Manager subject to the proviso that fair and reasonable compensation would not exceed actual cost to the school, plus an allowed percentage of profit.

In addition the schools were to be reimbursed for the cost of the tools plus 10% allowed for the work involved. Where the tools were purchased from an outside source a regulation provided "that the school will assure itself that the Veterans Administration is not billed at an unreasonable price", and that "such items will be billed at cost to the institution".

■ Regulations adopted in compliance with the Act have full force and effect of law and form a part of all contracts between the Veterans Administration and the educational institutions. Karas v. United States, D.C., 118 F. Supp. 446, at 449, affirmed 3 Cir., 214 F. 2d 130. As a matter of law and by specific provision in each contract herein involved, the parties agreed that the terms of the contract were subject to and governed by appropriate regulations.[7]

Defendants organized and operated five trade schools[8] and over a period of sixteen months entered into twelve contracts with the Veterans Administra-

stering the prosecution's case, see United States v. Goldstein, 2 Cir., 168 F.2d 666, at page 670; Ercoli v. United States, 1942, 76 U.S.App.D.C. 360, 131 F.2d 354, 357.

3. Public Law 346, June 22, 1944, 58 Stat. 284, Tit. II at 287 et seq., § 5, p. 289, "The Administrator shall pay to the * * * institution, * * * the * * * cost of tuition, * * * and may pay for books, supplies, equipment, and other necessary expenses * * *." Veterans' Regulation No. 1(a), pt. 8, § 5, 38 U.S. C.A. following section 745.

4. Id. § 9, p. 290.

5. May 19, November 27, 1948, January 25, 1949. See 13 F.R. Tit. 38, chap. 1, part 36, p. 2696, § 36.287, 1st par. and (b); Id. p. 7220, 7221, § 21.530, 1st par. and (b); Id. p. 7222, 7223, § 21.539(a) general 1, 2, (e) charge (1) (6) (f) 2; and

see issue of January 25, 1949, p. 381, § 21.530(b).

6. (1) Actual cost of instruction; (2) Consumable instructional supplies; (3) Depreciation; (4) Reasonable rent; (5) Building operation and maintenance; (6) Taxes and insurance; (7) Administrative expenses; (8) Advertising.

7. Art. 7, Limitations, "It is understood and agreed that the terms of this contract are subject to, and will be governed by, Veterans Administration regulations issued pursuant to Public Laws 16 and 346, as amended. * * *"

8. Northeast Schools, Inc., November 3, 1948; Lee School of Trades, Inc., February 15, 1949; Parker Body and Fender School, Inc., March 29, 1949 (formerly Crown Body and Fender School, Inc.); Marshal Carpentry and Cabinet Making School, Inc., May 13, 1949; Diamond Trade Schools, Inc., June 28, 1949 (all Pennsylvania corporations).

tion agreeing to furnish courses to enrolled veterans.[9,10]

Defendant Weinberg negotiated and signed all contracts as president of each particular school, except as to Diamond where he signed as treasurer, and as to each school presented cost statements to the Veterans Administration certifying as to their truth and accuracy.[11]

Between December 3, 1948 and November 9, 1950, the five schools billed the Veterans Administration and were paid:[12]

There was substantial competent testimony showing that the five schools billed the Veterans Administration for excessive amounts contrary to law and the intent, purpose and meaning of the con-

9. Northeast, G. 19, 19A, 12/3/48–5/31/49, G. 26, 6/1/49–5/31/50, G. 27, 12/1/49–11/30/50. Crown, G. 22, 22A, 2/2/49–7/31/49, ended 5/9/49. Parker, G. 23, 5/10/49–10/31/49, G. 28, 11/1/49–10/31/50. Marshall, G. 20, 20A, 5/18/49–10/31/49, G. 21, 11/1/49–10/31/50. Diamond, G. 24, 5/16/49–8/31/49, G. 29, 9/1/49–2/28/50. Lee, G. 18, 3/30/49–9/30/49, G. 25, 10/1/49–4/30/50.

10. Pertinent provisions as to tools were as follows: Northeast, G. 19, "(c) The Contractor will furnish * * * to the veteran, as needed, such books, supplies and equipment as are necessary. * * * (d) The Veterans Administration will compensate the contractor * * * shall not exceed $99.61 per veteran for the completion of the course * * * to be selected from the 'tool list' * * * institution * * * may add * * * ten percent (10%) of the total as compensation for handling and issuing . . . such materials * * *." G. 19A, "* * * shall not exceed * * *." Supplements 2 and 3, no reference to tools. G. 26, "* * * At actual cost to the school and not to exceed * * *." G. 27, "* * * All references * * * (to tools) * * * stricken." G. 27A, "* * * at cost to the institution in an amount estimated not to exceed * * *." Crown, G. 22, "* * * shall not exceed * * *." G. 22A, no refer-

erence to tools. Parker, G. 23, "* * * shall not exceed * * *." G. 28, provisions as to tools stricken. Marshall, G. 20, "* * * At cost to the institution in an amount estimated not to exceed * * *." G. 20A, "* * * at cost to the institution in an amount estimated not to exceed * * *." G. 21, provision as to tools stricken. Diamond, G. 24, "* * * at cost but in no case to exceed * * *." G. 29, "* * * At cost to the institution * * *." Lee, G. 18, "* * * At cost to the institution in an amount estimated not to exceed * * *." G. 25, provision as to tools stricken.

11. Northeast, G. 56, 12/9/48–4/30/49, September 28, 1949, ". . . true and correct to the best of my knowledge and belief." G. 37, 6/1/49–11/30/49, January 5, 1950, true and correct and in accordance with the books and records of the school. Lee, G. 39A, 3/30/49–9/30/49, October 7, 1949, as in G. 37. G. 39B, 5/12/49–9/30/49, October 18, 1949, as in G. 37. Parker, G. 38, 5/10/49–10/31/49, November 1, 1949, as in G. 37. Marshall, G. 40, 5/23/49–9/30/49, October 26, 1949, as in G. 37. Diamond, G. 36A, no period stated, "I certify the above statement is true and correct to the best of my knowledge." G. 36, 5/10/49–8/31/49, September 16, 1949, as in G. 37.

| 12. | (a) | | (b) | (c) |
|---|---|---|---|---|
| | Northeast | $204,803.79 | $ 67,690.01 | $ 47,421.08 |
| | Lee | 53,494.12 | 23,595.22 | 31,063.64 |
| | Crown | 16,122.78 | 16,053.43 | . . . . . . |
| | Parker | 59,831.10 | 4,890.59 | 21,087.72 |
| | Marshall | 60,887.13 | 16,576.84 | 16,614.18 |
| | Diamond | 116,442.42 | 42,669.14 | 33,985.47 |
| | | $511,581.34 | $171,475.29 | $150,172.09 |

Tuition $511,581.34 a Tools $171,475.29 b Total $683,056.63
Billed and unpaid up to the time of trial:
Tuition $150,172.09 c Tools $ 3,034.66 Total $153,206.75

(Diamond) $836,263.38

tracts amounting to an overpayment for tools of $67,407.30,[13] an overstatement of consumable supplies of $14,997.85.[14]

The modus operandi was as follows: In four of the schools defendant Weinberg was president, treasurer and one of three directors; defendant Bird vice president and director; in Diamond defendant Weinberg was treasurer and director, and to have charge of all purchases of tools and consumable supplies. All issued stock was divided; Northeast, each 20 shares; Lee, each 50 shares; Parker, Weinberg's interest 37½ shares, Bird's interest 62½ shares; Marshall, defendant Weinberg et ux each 50 shares; Diamond, Bevans 50 shares, each defendant 25 shares.

Unknown to each other before the school venture, defendants became close personal friends within a few months. A joint bank account was opened, each depositing $20,000;[15] a check for $30,000 given to Attorney Louis Shaffer to purchase a building to be occupied by the Lee School; $22,500 by defendant Bird, $7500 by defendant Weinberg to Attorney Donald Mills to purchase the Crown School.[16]

All of the schools, except Diamond, paid monthly rental for space in defendant Weinberg's office: Northeast, $75; Lee, $100; Parker, $50; Marshall, $50. The books and records of all five schools were kept there in charge of the same bookkeeper.

Defendant Weinberg had formerly had experience in buying and selling tools and supplies and was familiar with wholesale and retail prices and volume

13.

| | Overcharge | Difference between amount purchased and amount billed to Veterans Administration |
|---|---|---|
| Northeast | $17,418.48 | $13,805.29 |
| Lee | 8,086.88 | ...... |
| Parker | 6,343.07 | 1,220.59 |
| Marshall | 5,714.00 | ...... |
| Diamond | 14,818.99 | ...... |
| | $52,381.42 | $15,025.88 Total $67.407.30 |

Northeast records show purchases of tools $50,177.31 plus 10% for handling, $53,884.72; excess amount claimed $13,805.29. Similar calculations show an excess amount claimed in Lee, $1,220.59; total, $15,025.88.

14. 
| | |
|---|---|
| Northeast | $ 6,363.67 |
| Lee | 3,388.29 |
| Parker | 2,752.15 |
| Marshall | 194.59 |
| Diamond | 2,299.15 |
| | $14,997.85 |

Thereby pro tanto improperly increasing the basic figures upon which the tuition rate was based.

15. February 7, 1949–June 2, 1950, net deposits and withdrawals $130,733.62, used principally to provide paid-in capital, finance the five schools and Mercury Distributors Inc.

16. A check on the joint account for $5000 to James E. Morgan, defendant Bird's nephew, to start the Kay School with defendant Weinberg. The venture was abandoned and the balance returned to defendants' joint account. A check for $1000 to reimburse Charles Kearney who withdrew from a partnership with defendants as to a proposed trade school in Honesdale. $10,000 advanced to Howard Everitt, a business associate of defendant Bird, to start the Marshall School. When Everitt declined defendants continued with the project, on occasion making loans to the school. Both defendants went together to Pottsville and persuaded Mr. William Bevan to join them in organizing the Diamond School.

discounts. Mr. Edwin J. Jones of Charles B. Scott Co., Mr. Calvin A. Tinsley of Harris Hardware and Supply Co., Mr. Harold J. Harris of Stull Brothers, all large suppliers in the area, testified that if the schools were to purchase directly from them in large amounts they would have been able to obtain prices; as to Scott at cost plus 10% or at least 33⅓% off list; Harris Hardware, cost plus 10%; Stull Brothers, 20% off list. Instead of permitting the schools to purchase tools and consumable supplies in the market place at the best prices obtainable, defendant Weinberg arranged and ordered that all tools and consumable supplies for the five schools were to be ordered from, purchased by, and supplied through his office which would handle all contacts with the Veterans Administration. February 15, 1949,[17] defendants organized Mercury Distributors Inc.[18] The stock was equally divided, the interest of each defendant receiving 25 shares. Defendants named John Yekel, a long time employee of defendant Weinberg at $50 weekly, as president at a salary of $65 per week;[19] defendant Bird vice president; Arthur Jenkins, brother-in-law of defendant Weinberg, as secretary and treasurer to serve without pay; defendant Weinberg sales manager. Although Jenkins was named treasurer, all money matters were to be in charge of defend-

ant Weinberg. Neither Yekel or Jenkins had any financial interest in the schools. Both disclaimed any knowledge of prices charged to the schools, either as to amounts, percentage of mark-up, or by whom such matters were determined. Yekel testified that the schools were charged higher prices than Charles B. Scott Co., Harris Hardware and Supply Co., and Stull Brothers; that the price to the companies was determined on a friendship basis, and that the marked up price on Mercury invoices would merely add to the school's account with the Veterans Administration. Besides the five schools Mercury Distributors dealt with six other area trade schools having contracts with the Veterans Administration and charged them the same prices as the schools in question. The books and records of Mercury were kept by the same bookkeeper who kept the books of the schools.

When a representative of the Veterans Administration, checking into the reasonableness of rent, cost of consumable supplies and tools to the schools, to ascertain the true cost thereof and to see if they were billed to the Veterans Administration at a reasonable price, learned of Mercury he reported to the Veterans Administration; returned and asked permission of defendant Weinberg to examine Mercury's books and records. Defendant Weinberg refused

17. Defendant Bird was familiar with the 10% allowance for handling tools and with the steps necessary to incorporate and operate trade schools. As to details, he advised the witness Kearney that "Weinberg takes care of everything". In court he stated, "I was interested in the schools financially, not in the running of them". N.T. 1481. He was familiar with defendant Weinberg's experience in handling supplies and tools; knew that they were being sold to the schools and that the Government was paying for them. Defendant Bird stated that they were in the supply business for profit and that he had agreed to let defendant Weinberg run the Mercury business. Said defendant Weinberg, "* * * he knew what I had in mind * * * what I thought could be done in the way of possibilities of a supply business * * * he wasn't a partner who participated ac-

tively or who projected himself into the picture * * * he left it entirely to me and I tried to do the best for him and myself that I could." N.T. 1351, 1358.

18. A Pennsylvania corporation. Louis Shaffer and two other attorneys were the incorporators and first directors. February 17, 1949, all subscription rights were assigned to defendant Weinberg. March 18, 1949, an affidavit of paid-in capital ($1500) was sworn to by the defendants and James T. Bird, defendant Bird's son. Yekel, Jenkins and Weinberg were named directors. No names of officers were shown on the Mercury stationery.

19. On occasion rendering service for defendant Weinberg as in the past but without additional salary.

permission stating that he was doing so upon advice of counsel. Defendant Weinberg advised that Mercury was a corporation and that there was a mark-up in prices charged the schools over that at which Mercury purchased them,[20] in some cases 35—40—50%.

Total sales of tools by Mercury
plus discount............... $190,423.92
Cost of goods sold (purchases less inventory adjustment— deductions of purchase discounts)—January 29, 1949— January 31, 1950.......... 124,298.48
_____
$ 66,125.44

Gross profit of 34.73%.[21]

A similar calculation as to consumable supplies showed a gross profit margin of 31.24%. The theory of the Government was that the mark-up by Mercury to the schools was wholly unwarranted, that it was a scheme for the sole purpose of marking up and inflating the cost of consumable supplies which affected the tuition rate and the cost of tools for which the Government separately reimbursed the schools, all for the purpose of defrauding the Government.

Defendant Weinberg testified that, notwithstanding the provisions of the contracts and the regulations, "not to exceed" defined the limit of charges to be made and that this figure need not be the actual cost when billing the Veterans Administration. Defendant relied upon purported conversations allegedly had with one Shimshock and Capparell that the Veterans Administration would be satisfied as long as the charges did not exceed the outside limit on the tool list, and that they did not care where or from whom the tools were purchased. Said the defendant, "I didn't testify. I had told them (the Veterans Administration) all about Mercury". N.T. 1385. Defendant at no time made a complete disclosure to the Veterans Administration; in fact, he refused to do so. While we ruled that there could not be any estoppel under the circumstances,[22] we permitted the testimony for whatever light it might throw on defendant's state of mind, United States v. Stoehr, D.C., 100 F.Supp. 143, affirmed 3 Cir., 196 F. 2d 276, 33 A.L.R.2d 836.

Crown School purchased 25 sets of tools from C. B. Scott on February 25, 1949, at a price 33⅓% off list—$2185.-10. The goods, covered by invoice, G. 41, were delivered to the Crown School. After defendants purchased the Crown School defendant Weinberg arranged for a credit memorandum in favor of Crown, and a new invoice to Mercury dated May 11, 1949, for the same tools at a price of $1965.85. The tools were then billed by Mercury to Crown, including the marked up price, for present purposes 34.73%.

Franconi Auto Parts sold and shipped 50 sets of tools and equipment at a price of $6000 to the Crown School on February 21, 1949. Although shipped direct from Franconi the tools were billed to the school by Mercury at a marked up price.

Lee School entered a lease with Louis Shaffer, landlord, agreeing to pay $1000 a month for the portion of the building

20. 58.47% of all tools purchased by Mercury ($73,867.58) came from four principal suppliers, Charles B. Scott Co., Harris Hardware and Supply Co., Stull Brothers, and Franconi Auto Parts.

21. Cf. testimony of witnesses Conover, Hagen, and Rocereto. Total sales to the five schools, $152,665.89, 79% of Mercury's total sales of tools. Most of the remaining 21% went to six other trade schools in the area.

22. See 54 Am.Jur., United States, § 124, The United States is not subject to an estoppel which impedes the exercise of the powers of government, and is not estopped to deny the validity of a transaction or agreement which the law does not sanction. Nor does an estoppel arise through an act or representation made by an officer or agent without authority to act for the government in the premises. Also see Id. § 60, and United States v. State of California, 332 U.S. 19, at page 39, 67 S.Ct. 1658, 91 L.Ed. 1889, and cf. Karas v. United States, 118 F.Supp. 446, at page 450.

occupied by the Lee School. Shaffer held title to the building as trustee for the defendants. The cost statement purported to show $6000 in rent actually paid; the records show only $1000 paid. When the Veterans Administration later learned of the common ownership the lease was cancelled and depreciation of only $150 per month allowed.

Within four months after incorporation, with a paid-in capital of only $1000, Northeast declared and paid a dividend of $375 per share ($15,000); within six months defendant Weinberg received $27,200 salary and director's fees of $400. He received $9200 salary from Mercury, $100 director's fees from Parker.

In addition to dividends from Northeast, defendant Bird received salary of $200 from Northeast, $4600 from Mercury, $1000 from Lee (at $200 per week), and director's fees from Northeast $400.

Defendant Bird resigned as vice president of Mercury August 17, 1949; as vice president and director of Marshall and was replaced by Bertie J. Weinberg as director August 22, 1949. A contract of Northeast, G. 26A, was cancelled by the Veterans Administration and mutual releases signed on January 3, 1950. Defendant Bird transferred his stock to his nephew, James E. Morgan, January 6, 1950, resigned and was replaced by Morgan as director January 9, 1950. He resigned and was replaced by Morgan as vice president and director of Lee January 16, 1950. His stock was transferred to Morgan June 2, 1950. After some discussion with Weinberg as to unpaid bills, Bird transferred his stock in Parker to Morgan April 13, 1950; resigned and was replaced by Morgan as director April 7, 1950. Defendant Bird's stock in Mercury was transferred to Morgan March 25, 1950. A sale of de-fendant Bird's share in Diamond to William Bevan was apparently not completed, only one-half of the proposed purchase price of $2000 having been paid. Defendant Weinberg advised Bird that they would both share in the final settlement as to all of the schools.

■ Objections were made to portions of the witness Shaffer's testimony, particularly to conversations with defendants based on the rule excluding confidential communications between counsel and client.[23] Shaffer had previously testified before the Grand Jury. Although named in the indictment as co-conspirator he was not indicted. Feeling that he had a right to testify in order to clear, insofar as possible, his own reputation, and because the matters in question occurred in the course of what was alleged and proven to be criminal conduct on the part of both defendants, we overruled the objections and permitted the testimony. See Vol. VIII Wigmore on Evidence, 3rd Ed., § 2298; Nadler v. Warner Co., 321 Pa. 139, at page 142, 184 A. 3; United States v. Bob, 2 Cir., 106 F.2d 37, 125 A.L.R. 502; A. B. Dick Co. v. Marr, D.C., 95 F. Supp. 83, at page 102; S. E. C. v. Harrison, D.C., 80 F.Supp. 226, at page 230; see Wigmore, supra, § 2299. At all events the objections were waived by defendants' discussion of the entire matter during the course of their respective testimony. See note 2, supra; and see Ladrey v. United States, 1946, 81 U.S.App.D.C. 127, 155 F.2d 417, at page 420.

■ Absent any challenge by way of credible evidence defendants' books of account could be used as admissions against interest. When using them as admissions the Government was not obliged to prove they were correct. United States v. Stoehr, D.C., 100 F.Supp.

23. Louis Shaffer resigned as secretary and director of Parker July 16, 1949; Marshall, August 22, 1949; Lee, October 17, 1949. He endorsed a note for Parker, one for Mercury, but denied that in doing so he was representing Bird. He was an incorporator and director of Mercury, trustee for title to and lessor of the building occupied by Lee; one of the signers of an affidavit of paid-in capital with defendants as to the Lee School; with defendant Weinberg in Marshall. The conversations in controversy occurred in February and March, 1949.

143, at page 157. Here the defendants sought to contradict the records of the schools and of Mercury, as well as a statement prepared by their own accountants, see and cf. Paschen v. United States, 7 Cir., 1934, 70 F.2d 491, at page 501, by offering what purported to be receipts signed by student veterans showing that they in fact had received tools. The parties were the Government and the defendants. To prove the contents students should be called and made subject to cross examination. The papers themselves offered affirmatively to prove their contents were hearsay and not the best evidence. The witness Szumsky testified to insertions being made after an alleged receipt was signed. Defendants' own books and records to show purchases as to the Northeast and Parker Schools and sales by Mercury were in the court room. Particularly apposite is Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, at page 130, 23 A.L.R.2d 1349. Under the circumstances the alleged receipts "were dripping with motivations to misrepresent". See and cf. two alleged receipts picked at random and marked as exhibits by the court, and see Hoffman v. Palmer, 2 Cir., 129 F. 2d 976, at pages 980, 981; Stillman v. United States, 9 Cir., 177 F.2d 607, at page 618. We did permit the defendant Weinberg to testify that of his own knowledge he knew that the required number of tools were present. Under the circumstances any jury would have difficulty in placing credence in that part of his testimony.

To sustain the conviction the indictment must charge and sufficient competent evidence must prove that two or more persons conspired to defraud the United States in the manner or for the purpose charged and that one or more of them did an act to effect the object of the conspiracy. The indictment charged that the defendants "did unlawfully, wilfully, knowingly, and feloniously conspire, confederate and agree together and with each other * * * to defraud the United States out of certain monies by fraudulently inflating the cost basis of the tuition rate and by fraudulently inflating and increasing the cost to be charged to the Veterans Administration * * *."

Thereafter the scheme and plan was spelled out and together with all other averments of the indictment, including the overt acts, was proved in detail by an abundance of competent evidence.

All allegations well plead in the indictment must be taken as true. United States v. Chrysler Corp., 9 Cir., 1950, 180 F.2d 557, at page 558. The indictment is sufficiently definite and complete to inform the defendants of the charge against them and of the manner and means of accomplishing it. It charged in proper and sufficient terms a violation of the statute. See Glasser v. United States, 315 U.S. 60, at page 66, 62 S.Ct. 457, 86 L.Ed. 680, and see and cf. Wong Tai v. United States, 273 U.S. 77, at page 81, 47 S.Ct. 300, 71 L.Ed. 545; 11 Am.Jur., Conspiracy, § 18, pp. 554–555; 15 C.J.S., Conspiracy, § 56, p. 1087.

It is not necessary to allege what acts were done to effect the object of the conspiracy nor set out all means agreed upon to carry it forward. If one or more means alleged to be used are proven, it is sufficient. United States v. Olmstead, D.C., 5 F.2d 712, 714. The statute was intended to secure the wholesome administration of the laws and affairs of the United States in the interest of the Government and to protect the government in its rights, privileges and operations. 15 C.J.S., Conspiracy, § 56, p. 1088; United States v. Moore, C.C., 173 F. 122; United States v. Stone, D. C.N.J., 135 F. 392; Curley v. United States, 1 Cir., 1904, 130 F. 1, at page 4, as to the scope of the act, and see Id. 8–11.

Congress aimed to protect the Government against those in whom avarice and cupidity are stronger than the desire for good government and honest execution of the law. See Mr. Chief Justice Taft in Hammerschmidt v. United States, 1924, 265 U.S. 182, at

page 188, 44 S.Ct. 511, 512, 68 L.Ed. 968, "To conspire to defraud the United States means primarily to cheat the government out of property or money, but it also means to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention." And see United States v. Keitel, 211 U.S. 370, at page 393, 29 S.Ct. 123, 53 L.Ed. 230.

"The reason why the agreement of two or more persons to commit a crime, or to do other unlawful things, is a public wrong, although the intent of one person to do the same act is no crime at all, is that a combination of united wills to effect a harmful object is far more dangerous to public welfare and safety than the criminal intent of a single individual. Human experience justifies the doctrine that the union of two or more persons in a common criminal purpose, where each associate aids and strengthens the will of the others, is much more likely to result in evil consequences than the mere intent of only one person." 3 Burdick, Law of Crime, 1946, § 984, and see Id. 1009, "It is not necessary that the fraudulent act * * * be a criminal act in itself, * * * it is sufficient if it is * * * inimical to public interests."

"It is elementary that if the object of a conspiracy is criminal, then evidence of conduct—otherwise lawful—but which is intended to achieve that criminal objective may properly be received to prove the conspiracy." American Medical Ass'n v. United States, 1942, 76 U.S.App.D.C. 70, 130 F.2d 233, at page 251; United States v. Holt, 7 Cir., 1940, 108 F.2d 365, at page 368.

[8] A conspiracy is a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose or to accomplish some purpose not in itself criminal or unlawful by criminal or unlawful means. Pettibone v. United States, 148 U.S. 197, at page 203, 13 S.Ct. 542, 37 L.Ed. 419; Marino v. United States, 9 Cir., 1937, 91 F.2d 691, at page 693, 113 A.L.R. 975. No formal agreement is necessary; a tacit understanding is sufficient and it is not essential that each conspirator have knowledge of the details of the conspiracy or the means to be used. Williamson v. United States, 207 U.S. 425, 28 S.Ct. 163, 52 L.Ed. 278. "The ultimate object was the securing of the money of the United States. * * It is not essential * * * that all contribute alike either to the making of the scheme or to its fulfillment. * * 'When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made "a partnership in crime." What one does pursuant to their common purpose, all do. * * *' Van Riper v. United States, 2 Cir., 1926, 13 F.2d 961 * * *." United States v. Harding, 1936, 65 App.D.C. 161, 81 F.2d 563, at page 566. It is not essential that the agreement be in any specified form or that any particular words be used. It is enough if the minds of the parties meet and join in an understanding way to accomplish a common purpose. Reavis v. United States, 10 Cir., 1939, 106 F.2d 982, at page 984.

Once proved the conspiracy must be deemed to continue until the contrary is established. United States v. Perlstein, 3 Cir., 126 F.2d 789, at page 798. As he has started evil forces he must withdraw his support from them or incur the guilt of their continuance. Hyde v. United States, 225 U.S. 347, at pages 369, 370, 32 S.Ct. 793, 56 L.Ed. 1114.

It is not necessary that the participation of the accused be shown by direct evidence. The connection may be inferred from such facts and circumstances in evidence as legitimately tend to sustain that inference. Indeed, often if not generally, direct proof of a criminal conspiracy is not available

and it will be disclosed only by a development and collocation of circumstances. In passing upon the sufficiency of proof, it is not our province to weigh the evidence or determine the credibility of witnesses. We must take that view of the evidence most favorable to the government and sustain the verdict of the jury if there be substantial evidence to support it. United States v. Manton, 2 Cir., 1938, 107 F.2d 834, at page 839, and see United States v. Stoehr, supra, 100 F.Supp. 143.

 The defendants under the circumstances had a duty to see that the government was not billed at an unreasonable price. They resorted to chicanery—a mean or unfair artifice to obstruct the truth, a sharp practice—in the rental arrangement at Lee, and in charging for tools they never had at Northeast and at Parker. The formation of Mercury was a mere sham to see that the government was in fact billed at unreasonable prices as to tools and given an unfair cost basis as to consumable supplies, for determination of fair and reasonable tuition rates. The evidence established and the jury by their verdict found that the defendants conspired to defraud the United States. The motions in arrest of judgment and for judgment of acquittal are therefore denied.

In support of their motion for a new trial, defendants assert error in ruling upon the reception and rejection of evidence; in the court's following the practice as to Grand Jury minutes, approved in United States v. Socony Vacuum Oil Co., 1940, 310 U.S. 150, at pages 233, 234, 60 S.Ct. 811, 84 L.Ed. 1129; in permitting the witness Shaffer over defendants' objections to testify to confidential communications; in the charge of the court and in the conduct of the trial.[24]

 What was said in Johnson v. United States, 1943, 318 U.S. 189, at page 202, 63 S.Ct. 549, 555, 87 L.Ed. 704, is likewise applicable to a trial judge reviewing the record on a motion for new trial. "In reviewing criminal cases, it is particularly important * * to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure." And see the observations of Judge Goodrich in United States v. Kafes, 3 Cir., 1954, 214 F.2d 887, at page 888, "Obviously the way to investigate this matter is not on the basis of the quotations here and there * * * but to read the report of the proceedings as the trial went on." "There is seldom any criminal or civil trial of any magnitude or duration into the record of which some irrelevant, incompetent, and immaterial testimony does not 'creep' and has been subsequently 'stricken out' and the jury instructed to 'disregard it.' To grant new trials whenever such a thing occurred would mean an interminable and intolerable succession of new trials." Commonwealth v. Fugmann, 330 Pa. 4, at page 18, 198 A. 99, 106. A defendant cannot complain of error, if any existed, which he himself created or invited. Shields v. United States, 3 Cir., 1927, 17 F.2d 66, at page 69. On the question of intent and state of mind, see United States v. Stoehr, supra, 100 F.Supp. at page 159. Evidence may be excluded if it is not germane and its only tendency would be to confuse the jury. Id. at page 155. As to the admission of evidence as to the claim for rent and shortage of supplies, see United States v. Klass, 3 Cir., 1948,

24. Reasons 13, 14, 122c, 123 as to defendant Weinberg; 13, 14, 99 and 100 as to defendant Bird were withdrawn. Instead of stating their position in the manner above indicated defendants have seen fit to spell out their objections to the court's ruling on the admissibility of practically each one of the 145 exhibits; on some occasions repeating the same subject matter under different headings. We have examined each and every reason and, where discussion was called for, it will be found in this opinion. On many rulings, our position thereon and the pertinent law is spelled out in the record. Having considered each and every reason on its own and in context, we find defendants' reasons wholly without merit.

166 F.2d 373, at page 377; Wood v. United States, 16 Pet. 342, at page 358, 41 U.S. 342, at page 358, 10 L.Ed. 987.

As to the asserted interruptions of counsel, see May v. United States, 1949, 84 U.S.App.D.C. 233, 175 F.2d 994, at page 1010, "We think that the court's interruption was not only correct but required."

On the question of the witness Shaffer's testimony, we add, Clark v. United States, 289 U.S. 1, at page 15, 53 S.Ct. 465, at page 469, 77 L.Ed. 993, "There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. * * * To drive the privilege away, there must be 'something to give colour to the charge'; there must be 'prima facie evidence that it has some foundation in fact.'" Certainly prima facie evidence had been established in this record at the time the witness was called.

The rules of court as to summation were discussed with counsel, N.T. 1567; the court made inquiry whether there were any points for charge, N.T. 1569; only three were submitted on behalf of defendants, and the views of the court expressed thereon. N.T. 1569, 1570.

[15] In a careful and thorough charge the applicable law was spelled out in detail together with a review of the testimony. Included in our charge was the more liberal rule as to circumstantial evidence; the jury being instructed that the evidence must be such as to exclude every reasonable hypothesis other than that of guilt. This in addition to a full and complete charge on reasonable doubt. See and cf. Holland v. United States, 1954, 348 U.S. 121, at pages 139, 140, 75 S.Ct. 127. Certainly such a charge gave the defendants more than they were entitled to. And see United States v. Schneiderman, D.C., 106 F.Supp. 906, at page 920.

At N.T. 1502, counsel for Weinberg attempted to elicit from the defendant Bird what he had found out as a result of the investigation into the standing of defendant Weinberg. We did not permit the inquiry; first, on the ground that it was a self-serving declaration; secondly, that such testimony, if relevant, should not be brought out on cross examination but offered on direct as part of the defendants' case.

At N.T. 1645, when the court concluded its charge defense counsel entered exceptions and objections at side bar. See N.T. 1645 to 1662. Whereupon the court endeavored to meet the requests of counsel and gave additional instructions extending from N.T. 1663 to 1666 inclusive. The court concluded with the question, "Is there anything else, gentlemen?" to which there was no response by counsel for either defendant. See 18 U.S.C.A. Rule 30, Fed. Rules Crim.Proc.; Berenbeim v. United States, 10 Cir., 1947, 164 F.2d 679, at pages 684, 685.

As to the instruction relative to the binding effect of the acts and conduct of each of the defendants as regards the other, and the question of agency, our instructions were taken from United States v. Olweiss, 2 Cir., 1943, 138 F.2d 798, at page 800, an opinion by Learned Hand, J., and see United States v. Avellino, 3 Cir., 1954, 216 F.2d 877, at page 880.

■ An indictment is an accusation only. Shaffer, Yekel, and Jenkins were presumed to be innocent. "Those having no knowledge of the conspiracy are not conspirators * * *." United States v. Falcone, 1940, 311 U.S. 205, at page 210, 61 S.Ct. 204, 207, 85 L.Ed. 128. An intention to become a party to an illegal enterprise must be predicated on some affirmative action. United States v. Harrison, 3 Cir., 1941, 121 F.2d 930, at page 933. None of the three had any financial interest in the venture. There was nothing to show that any of them knowingly participated in any scheme to defraud. The Grand Jury apparently did not find sufficient probable cause to indict them. Defense counsel on cross examination on the government's side endeavored to develop that none of the three had any connection whatsoever with the scheme or

plan charged. See N.T. 340–341, 405–409, 973–974, 1013–1014. The loss of the privilege of confidential communication does not "* * * depend upon the showing of a conspiracy, upon proof that client and attorney are involved in equal guilt. The attorney may be innocent, and still the guilty client must let the truth come out. * * *" Clark v. United States, supra, 289 U.S. at page 15, 53 S.Ct. at page 469, 77 L.Ed. 993.

■■■■■ Two or more people must participate to create the crime. Where an indictment for conspiracy names only two an acquittal or reversal as to one is an acquittal or reversal as to the other. United States v. Fox, 3 Cir., 1942, 130 F.2d 56; Worthington v. United States, 7 Cir., 1933, 64 F.2d 936, and see Annotation, 1931, 72 A.L.R. 1180; 1935, 97 A.L.R. 1312. A conspiracy may be established even though one of the parties named is not such a member, if the evidence shows that there are other persons in existence, one or more of whom were parties to such conspiracy. United States v. Fox, supra, 130 F.2d at page 58. Here the testimony did not show participation by any other than the two defendants. Cf. United States v. Fox, supra. The absence of such testimony in effect made the naming of the three as coconspirators a nullity and of no effect. If there was evidence of a conspiracy between the co-defendants or either of them with all or any of the three there could have been a verdict of conspiracy as to one of the co-defendants and an acquittal as to the other. See United States v. Hamilton, 26 Fed.

Cas. pages 90, 91, No. 15,288; Com. v. Brown, 1903, 23 Pa.Super. 470, at page 508, an opinion by Judge Rice, "Whether or not this is error depends upon the evidence. It is certainly not error where * * * there is no evidence that any other person than those named in the indictment was in the conspiracy * *." Heine v. Com., 91 Pa. 145, at page 149, "* * * if it sufficiently appears, from the record, that he was a confederate", and see 2 Wharton, Criminal Law, 12th Ed., § 1662, "where all are known". Com. v. Beard, 1911, 48 Pa.Super. 319, at page 342, "The jury cannot convict the absent defendant as one of the two; but it may, if the evidence so satisfy it, convict one of the defendants on trial of conspiracy with the absent one, while acquitting the other * * *." And see Donegan v. United States, 2 Cir., 1922, 287 F. 641, at page 648; United States v. McCann, 2 Cir., 1929, 32 F.2d 540, at page 542, and see and cf. United States v. Negro, 2 Cir., 1947, 164 F.2d 168, at page 171.

■■■■■ If there was any error in the charge of the court—we find none—it was in favor of the defendants and against the government.[25] Jurors owe a duty to follow the law as stated in the court's instructions and to apply the law so given in the facts found from the evidence. The presumption is that the jurors faithfully performed their official duties. United States v. Schneiderman, supra, 106 F.Supp. 906, at pages 924, 926, and see Berenbeim v. United States, supra, 164 F.2d 679, at page 684; Dunn v. United States, 284 U.S. 390, at page 394, 52 S.Ct. 189, 76 L.Ed. 356; United States v. Rosenfield, 2 Cir.,

25. "May I say to you in this case that there are two defendants. You can not convict one and acquit the other. You must either acquit the two or none at all, or convict the two or none at all. In other words, one person alone can not commit conspiracy. If there was a conspiracy by two persons and those two persons were these defendants and you are convinced of their guilt beyond a reasonable doubt, you should say so by your verdict. If you believe from the evidence in this case that one of the defendants was guilty of certain misconduct, criminal conduct, and the other wasn't, there is no conspiracy. You must, to find conspiracy, have two or more persons working together to commit the particular offense * * *." See N.T. 1616; also see N.T. 1120–1121, 1599, 1600. At pp. 1601–1602, counsel for defendant Weinberg intimated his objection to any other instruction. N.T. 1645 and 1660.

1932, 57 F.2d 74; United States v. Rollnick; 2 Cir., 91 F.2d 911.

Reading the testimony and the charge as an integrated whole (Boyd v. United States, 1926, 271 U.S. 104, 107–108, 46 S.Ct. 442, 70 L.Ed. 857; United States v. Berg, 3 Cir., 1944, 144 F.2d 173, at page 177), the record leaves no doubt that the case was fairly tried, submitted to the jury in a clear, impartial and thorough charge on both the facts and the law. The motion of each defendant for a new trial will therefore be denied.