## UNITED STATES v. BERG.

### No. 8554.

Circuit Court of Appeals, Third Circuit,
Argued June 23, 1944.
Decided Aug. 11, 1944.

Frederic M. P. Pearse, of Newark, N. J., for appellant.

Charles A. Stanziale, of Newark, N. J. (Thorn Lord, U. S. Atty., of Newark, N. J., on the brief), for appellee.

Before BRATTON* and JONES, Circuit Judges, and KIRKPATRICK, District Judge.

BRATTON, Circuit Judge.

An indictment containing eight counts was returned against Harry A. Berg, Theodore Keve, and Moe Schreiber. The first four counts each charged a separate use of the mails in furtherance of a scheme to defraud, in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338; and the last four counts each charged a separate solicitation of money for the use of the United States, with the intention of embezzling and converting such money, in violation of section 1106 of the Second War Powers Act, 1942, 56 Stat. 176, 184, 50 U.S.C.A.Appendix § 641e. Berg and Keve were found guilty on counts 1, 2, 5, 6, and 8; Berg was sentenced to two years on each count, with provision that the several sentences should run concurrently; and he appealed.

It is contended that there was no proof of the mailing of the letters set forth in the first and second counts of the indictment. Though the formation of a scheme to defraud is essential, the gist of the offense charged in each count is the mailing of the letter in furtherance of the scheme. That is the crux of the offense, and it must be proved by competent evidence. But it is not necessary that there be direct proof that the accused mailed the letters or caused them to be mailed.

---

* By assignment.

Like many other facts, it may be established by circumstantial evidence. Freeman v. United States, 3 Cir., 20 F.2d 748; Whealton v. United States, 3 Cir., 113 F. 2d 710. The circumstances proved, however, must directly support an inference of the fact and exclude all reasonable doubt concerning its existence. Whealton v. United States, supra.

Appellant and his co-defendants below engaged at Trenton, Asbury Park, and New Brunswick, New Jersey, in a campaign to raise funds. They operated under the name of "New Jersey State Buy a Bomber Fund", and it was represented that the funds would be devoted to the purchase of a bomber to be presented to the United States for use in the prosecution of the war. These letters bore the letterhead "New Jersey State Buy A Bomber Fund"; the first was signed "H. A. Berg, Director of Publicity, N. J. State Buy a Bomber Fund"; and the second was signed "H. A. Berg, Sec. New Jersey State Buy A Bomber Fund, T. Spencer, Director of Publicity". Appellant dictated all publicity letters to a certain young woman employed as secretary and stenographer; she typed the letters; he signed and mailed them, if he had the time; and if he was too busy and did not have the time, she mailed them, but one or the other did the mailing; and he gave her instructions as to the mailing. Testifying in the case, she identified the name signed to one of the letters as being the signature of appellant, said that the name signed to the other looked like his signature, and said that she remembered mailing one of the letters but had no recollection as to the other. Both letters were received by the addressee through the mails. These facts and circumstances, considered in their totality, were sufficient to warrant the jury in drawing the inference that the letters were deposited in the post office by appellant or under his direction. Stokes v. United States, 157 U.S. 187, 15 S.Ct. 617, 39 L.Ed. 667; Lewy v. United States, 7 Cir., 29 F.2d 462, 62 A.L.R. 388; Federman v. United States, 7 Cir., 36 F.2d 441; Cochran v. United States, 8 Cir., 41 F.2d 193; Gantz v. United States, 8 Cir., 127 F.2d 498; Steiner v. United States, 5 Cir., 134 F.2d 931.

Neither Freeman v. United States, supra, nor Whealton v. United States, supra, is to the contrary. In the Freeman case it was charged that a false inventory and financial statement of a corporation had been sent through the mails in furtherance of a scheme to defraud, and the only circumstance which connected the accused with the mailing was that the enclosures bore his signature and in one instance a month or two before he had been asked for a statement of the company. In the Whealton case, the addressee had purchased several oil royalty certificates from the brother of the accused, and he received the letter set forth in the indictment through the mails. But there was no proof that the accused signed the letter, and none that he either mailed it or caused it to be mailed. Here, there was proof that the name signed to one of the letters was the signature of appellant, that the name signed to the other appeared to be his signature, that he either mailed all outgoing publicity letters himself or the employee mailed them under his direction, and that she deposited one of the letters in the post office. That evidence distinguishes on clear ground this case from the Freeman and Whealton cases.

Next, it is urged that the letters were not in furtherance of the scheme charged. The scheme as laid in each count was that the defendants would represent that they had organized a campaign to solicit and obtain contributions for the purchase of a bomber to be named "Ray of Light" in honor of the late Thomas A. Edison; that after the funds had been raised and the bomber purchased, the defendants would present it to the United States for use in the prosecution of the war; that prominent citizens had endorsed and were interested in the campaign, including Charles Edison, Governor of New Jersey, and others; and that the persons connected with the campaign were devoting their time, labor, and efforts, without cost or charge. It was charged as a further part of the scheme that persons would be solicited by telephone to make contributions; that employees would then be sent to the homes and places of business of such persons and would present to each such person a contract purporting to authorize a radio station to give radio time for the purpose of advertising the business of the person, stating in the course of the advertising that the person had contributed to the bomber fund. It was charged that through such means the defendants intended to solicit and obtain large sums of money, purporting to obtain it for the bomber fund; and that in fact they did not intend to purchase a bomber for the use of the United States, but intended to convert the money to their own

use and benefit. It was stated in the first letter that the campaign would go into action the following week; that the first story concerning it appeared in a recent issue of a local paper; that everyone connected with the campaign was donating his time; that all money sent to the banks would go toward the purchase of the bomber; that it would cost $190,000; that New York had raised $250,000, and Philadelphia close to $200,000; that it would be a disaster if New Jersey should fail of its purpose; that the campaign was in desperate need of publicity, radio and newspaper advertising, signs, stamps, and bomber barrels; that it was only through the help of firms such as the addressee that the ball would start rolling; that the writer would phone the addressee later to discuss the matter further; and that he knew the addressee would do all it could "to help the State of New Jersey Send A Bomber Over There— To Keep Our Freedom Over Here." The second letter made grateful acknowledgment of a contribution in the publicity campaign; stated that as the addressee had read in its local paper, those conducting the campaign were working to raise funds to enable the State of New Jersey to purchase a bomber in the name of its citizens; and further stated that everyone connected with the campaign was donating his time, and that all money sent to the banks would go toward the purchase of the bomber. It concluded by saying that the donation of these announcements over the radio in the name of the addressee was gratifying.

■ In order to constitute an offense under section 215, supra, it is necessary that a scheme to defraud be devised, and that afterwards a letter, postal card, package, writing, circular, pamphlet, or advertisement be placed in the mails for the purpose of executing the scheme, or attempting to do so. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548; Depew v. United States, 3 Cir., 255 F. 539; Newingham v. United States, 3 Cir., 4 F.2d 490; Blue v. United States, 6 Cir., 138 F.2d 351. But the matter mailed need not be effective in carrying out the scheme. Newingham v. United States, supra. It is not necessary that as the result of the particular matter mailed, the addressee be defrauded or suffer any loss. Cowl v. United States, 8 Cir., 35 F.2d 794; United States v. Rowe, 2 Cir., 56 F.2d 747. And it is not essential that it disclose on its face a fraudulent purpose. Chew v. United States, 8 Cir., 9 F.2d 348. But it must have some relation to the scheme, and be mailed with the intent of assisting in carrying such scheme into effect. Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709. It does not require elucidation or elaboration to make it crystal clear that these letters had some relation to the scheme laid in the indictment, and that they were mailed with the intent of assisting in carrying the scheme into effect. That was enough.

■ The sufficiency of the evidence to sustain the charge contained in counts 1, 2, 5, 6, and 8, respectively, is challenged. There was evidence tending to show these facts: Offices were established in three cities, telephones were installed, and letterheads were printed containing the names of the Governor of New Jersey, mayors of various cities, and others. Salesmen and others were engaged. The salesmen obtained from telephone or other directories a list of names. They then called by telephone those on the list, told the persons that they were calling for the organization, referred to the interest of the Governor and others in the campaign, solicited contributions to the fund, and stated that a representative of the organization would come in person. Women then followed up the calls. They went to the places of business of the persons called, stated that they had come from the organization, sometimes stated directly and sometimes gave the impression that the money solicited would be used in the purchase of the bomber, presented for signature a contract with a radio station, authorizing the station to give time to advertise the business of the signer, and stating in that connection that the person or business was a contributor to the bomber fund. The sums paid to the women at the time of signing the contract usually ranged from $7 to $21, depending on the radio time to be used. The women took with them a poster and a red, glass bomber barrel, about four inches in height, and about two inches in circumference. These were left on the counter or elsewhere in the place of business. The poster explained that money was to be dropped into the barrel by those desiring to contribute to the fund. Some of the persons whose names appeared on the letterheads had not endorsed the campaign and did not consent to the use of their names. The men who did the soliciting by telephone, and the women who called in person and received the money, were not contributing their time

without cost or charge. They were being paid. Keve sometimes used the name Ted Spencer; one of the men engaged in telephoning and one of the women engaged in making personal calls, each used another name; the women were instructed to state or give the impression that the money received was to go to the bomber fund, and if questions were asked to be evasive and dodge the issue; one woman was directed to say in the event she was picked up by the police that she was a voluntary worker; and on one occasion Keve came into the room where the telephone calls were being made and told the men that an officer was coming that afternoon to listen in on the talk, and that while he was there they were not to use the name of the Governor or that of the Mayor of New Brunswick. The money which accumulated in the barrels, and some contributions made directly to banks, totaled about $1500. Appellant and his associates did not appropriate or convert any of it to their own use. The money paid to the women at the time of the signing of the contracts, and by the women delivered to appellant and his associates, amounted in the aggregate to more than $9000. Generally, half of it went to the radio station, and the other half to appellant and his associates. The campaign ended, no effort was made to apply any part of the money to the purchase of a bomber, and appellant and his associates moved on to another field. The evidence, together with the inferences fairly and reasonably to be drawn from it, was sufficient to prove the offenses charged in the counts in question.

The remaining contention is that the court refused to give to the jury a requested charge. But the charge of the court covered the entire case. It was complete, and covered adequately the matter to which the requested charge related. A court is free to use language of its own choice in charging the jury. And it is not error to refuse a requested charge where the general charge is reasonably complete, fairly accurate, and sufficiently covers all of the material issues in the case. Indianapolis & St. Louis Railroad Co. v. Horst, 93 U.S. 291, 23 L.Ed. 898; Meyer v. Richards, 3 Cir., 111 F. 296; Mills Novelty Co. v. Peck, 3 Cir., 158 F. 811; Fair v. Floyd, 3 Cir., 75 F.2d 920; Anzano v. Metropolitan Life Insurance Co., 3 Cir., 118 F.2d 430.

The judgment is affirmed.