**UNITED STATES v. BOWCOTT et al.**

No. 9325.

United States Court of Appeals
Seventh Circuit.

Oct. 29, 1948.

Rehearing Denied Nov. 10, 1948.
Writ of Certiorari Denied Jan. 17, 1949.
See 69 S.Ct. 482.

George W. Sprenger, of Peoria, Ill., for appellants.

Howard L. Doyle, U. S. Atty., and Marks Alexander and George R. Kennedy, Asst. U. S. Attys., all of Springfield, Ill., for appellee.

Before SPARKS, Chief Judge, KERNER, Circuit Judge, and BRIGGLE, District Judge.

SPARKS, Chief Judge.

Appellants appeal from their conviction on a charge of using the mails to defraud in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338.[1] The principal errors urged on the appeal relate to the overruling of the demurrer to the indictment, the admission of certain evidence, and the denial of their motion for acquittal.

The details of the scheme to defraud varied as described by different witnesses, but the evidence substantially supports the project as set forth in Count I of the indictment. Appellants solicited funds which they stated were to be invested in a plant which Henry Ford and the Ford Motor Company contemplated operating in Fulton County, Illinois. "Investors" were promised not only employment in this enterprise, but also enormous profits. They were also told that Mr. Ford was desirous of using the enterprise as a means of distributing surplus income in the form

---

[1] In 1948 Revision, 18 U.S.C.A. § 1341.

174

of charitable contributions for which he could obtain deductions for income tax purposes, and that he would make such gifts to those persons who manifested confidence in him by investing in his enterprise. Having obtained moneys by means of these representations, in order to prevent demands for their return or at least for accounting, appellants paid small amounts purporting to be from earnings to certain of the "investors," and in a few cases where these investors were insistent upon return of their investments and threatened publicity or prosecution, moneys paid by other "investors" were used to reimburse them in full. As a further part of the scheme, in order to allay the suspicions of such of the investors as had become dissatisfied, appellants made further promises, oral and written, as to the vast profits to be made if the investors left their funds with appellants instead of withdrawing them.

The letters on which the various counts of the indictment were based consisted of promises to pay at certain times, explanations why payments were not made as promised, and repeated promises as to the bonuses which were to be had if the investors would only wait a little longer. One promised to pay the principal amount at once if the investor insisted, but repeated the bonus promises if the recipient would only wait. These letters were dated from 1941 to 1943, during which time the notes hereafter described indicate that the scheme continued in operation with new solicitations and new collections. The use of the United States mails for the transmission of each of the letters of the indictment was fully established by the evidence.

Mrs. Bowcott had been a fortune teller for many years in Fulton County and it appears that her clientele constituted the principal source of her victims. When persons came to her for the purpose of obtaining readings of their fortunes, she advised them of the wonderful possibilities for obtaining enormous profits by investment in the Ford project, and also of sharing in the charitable distributions of Henry Ford intended to enable him to reduce his income tax liabilities. Both

appellants gave their investors notes for amounts invested. Many of these notes were introduced in evidence. They varied in form. Some were judgment notes. All were short term, due in from thirty to ninety days. They were for amounts ranging from five dollars to seven hundred, and all promised bonuses in different proportions, from double to one hundred times the amount. One ninety day judgment note signed by Woodcock recited a promise to pay the $200 principal, and, at the foot, stated, "Bonus 1 farm 156 acres more or less near Brereton Ill." Another ninety day, $200 judgment note recited at the foot, "1 farm 283 acres more or less in the N½ of Sec. 23. Farmington twp. $100.00 lien." Another, for $285, stated "Bonus $28,500/00 double."

Both appellants testified in their own behalf, and each stated that she had herself invested in the scheme and still believed in its genuineness.

Mrs. Bowcott testified that one Harold J. Martin came to her home for a reading in 1938, and at that time told her that he had a good proposition on which he would like to have her work with him. He then disclosed the plan of the Ford Motor Company to take over a plant formerly operated by the International Harvester Company in Canton, Illinois, and add new buildings for a soy bean factory and other purposes. This, he stated, would open up prospects for new employment for all investors. He was to be president of the new unit, and one George Arnold whom she stated she met on a trip to Chicago a little later, was to be vice-president. According to the plan which they unfolded to her, she was to put any funds collected into envelopes with the name of the contributor on each and give them all to a messenger who would call at her door for them. Martin gave her the names of two such messengers. He told her to give each investor a note for the amount of his investment and the bonus, "whatever the bonus was the messenger would tell me on that day for that day. Some days it was a dollar, two dollars, and it varied." She testified that one of the messengers would come to her home for the money and to bring her instructions. They did

not come regularly—some times every day, and again only once a week. This continued from 1938 until the FBI began investigating, and the last she heard from Martin was late in 1943.

Mrs. Bowcott had no receipts from Martin or either of the messengers; she did not know where any of them lived or where headquarters were; she had received letters from Martin and Arnold, but she had burned these when the the "FBI was hounding me." The only witnesses who ever saw Martin were the two appellants and the husband of one of them; otherwise, people whom appellants named as having met him were all dead, and Mrs. Bowcott stated that she had heard that Martin himself died during 1944, though she had never verified this. After Mrs. Woodcock's arrest in 1943, she left town and remained away until she was picked up in Missouri about two years later. She said she got a tip-off, "That they had arrested Edna Woodcock and for me to get out of town."

Mrs. Woodcock, testifying in her own behalf, stated that she had operated a milk route around St. David, Illinois, from 1937 on; that some time in 1938 she had met Martin through a friend of the family (since deceased) who suggested that she might be interested in an investment scheme so she would have money enough for the education of her daughter. Although her description of the scheme is far from clear, it appears that she was to put in her own money, apparently to be derived from her farm of sixty acres in which she said she had invested $10,000, and that also she was to solicit others to likewise invest their funds, all to be invested in short term loans at six per cent or more. She was to receive her expenses and a salary for her activities. She maintained an office rendered necessary because "the people that heard about it would come to me and want me to take their money and invest it where I had mine and naturally it began to accumulate until I couldn't take care of their interest and I had to have a place where I could have my records and my files." The office was also headquarters for Mr. Martin when he was in town, but she did not know where he stayed at such times, and his home was "where he hung his hat."

Mrs. Woodcock first learned that Mrs. Bowcott was interested in the same investment scheme in 1939, and she signed some "renewal" notes with her, knowing that if the money were invested with Mr. Martin it was all right, although she had not seen it. She denied ever using the Ford story, explaining her reason for carrying so many of the Bowcott investors in that scheme as merely an accommodation for Mr. Martin. Although either he or one of his messengers came to the office practically every day, no one else ever met them or even saw any of them, not even the stenographer whom, she testified, Martin put through business college in order to qualify her to work in the office. This office appears to have been equipped with the usual office paraphernalia including files, and a typewriter, which the evidence showed had been rented by Mrs. Woodcock. The records had been removed from these files, however, by Martin, according to Mrs. Woodcock's testimony, after her arrest, and she had nothing whatever to show his participation in the scheme. It appears from some of the letters introduced in evidence that a regular filing system was probably used—one letter bore what appeared to be a file number, 1404, and another, 2304.

■ Appellants' first contention is that the demurrer to the indictment should have been sustained for the reason that the letters relied upon to support a charge of use of the mails to defraud were all written after the scheme, if any, had been consummated. It is true that appellants do not appear to have made use of the mails for their initial solicitation of funds for "investment." However, the letters were all of the typical "lulling" variety, and as such, calculated to prevent inquiry into the fraudulent scheme. As such they aided in furtherance of the scheme to defraud and constituted a proper basis for the charge of the indictment.

■■ Appellants contended that counts two to nine, inclusive, on which they were found guilty, were fatally defective in

that they failed to charge an offense against the United States, and to properly allege facts constituting such an offense. The basis for this contention is that all these counts referred to the scheme described in the first count of the indictment, and incorporated such scheme by reference instead of setting it out in full. Upon trial, however, the first count was dismissed by the Government, which action, they assert, removed it from the indictment for all purposes including incorporation of any part of it in subsequent counts. We cannot agree with this contention. As this court held in Linn v. United States, 7 Cir., 234 F. 543, 545, "It is well settled that it is not necessary in each count of an indictment to restate the scheme or artifice to defraud, which has been duly set forth in another count, but that apt reference in the counts * * * to the scheme as it is so set forth in another count, is sufficient and proper." It has been further held that reference between counts is not bad because the scheme was set out in a count which was incorporated by reference into succeeding counts but quashed by the trial court. Aiken v. United States, 4 Cir., 108 F.2d 182. To the same effect is Bennett v. United States, 5 Cir., 89 F.2d 52, that in a prosecution for use of the mails to defraud, the fact that the only count of the indictment which set forth the fraudulent scheme in detail charged an offense without the court's jurisdiction did not defeat its jurisdiction to try the offenses charged by other counts which referred to the first count for description of the fraudulent scheme. See also Wheeler v. United States, 9 Cir., 77 F.2d 216; United States v. Monjar, D.C., 47 F.Supp. 421, affirmed 3 Cir., 147 F. 2d 916, certiorari denied, 325 U.S. 859, 65 S.Ct. 1191, 89 L.Ed. 1979.

■ Appellants further complain of the wrongful admission of certain evidence alleged to have been highly prejudicial. This evidence consisted of certain letters purporting to have been written by Howard L. Doyle, United States District Attorney for Peoria and Springfield, Illinois. The letters were admittedly and obviously not genuine.[2] Some were addressed to Mrs. Woodcock herself, and others to victims of the scheme. They were introduced in evidence in rebuttal after both appellants testified in their own behalf as to their good faith and complete lack of fraudulent intent in all the operations ascribed to and admitted by them. Mrs. Woodcock admitted taking the one set forth in the margin to McGrew to whom it was addressed, but stated that she received it from a messenger with instructions to do so and did not know its

---

[2] "April 28, 1946

"Dear Mr. & Mrs. McGrew:—

"I am your Dist. Atty. Howard L. Doyle. And you I do know you will wonder why I am writing to you, Mr. & Mrs. McGrew, I am helping Mrs. Edna Woodcock. To get everything in order, it is just like this Mr. & Mrs. McGrew when a man or women are right I am with them, and this is not no confidence or fraud game, for I know, for I have seen the money and there money for all and I am also saying that it is not Mrs. Woodcock fault for that women has been more than true blue to you all. This is no confedence game it just as Mrs. Woodcock says it is. But the people and atty make it much more than fraud game, and that is just why I am doing all in my power to help Mrs. Woodcock. For no women would take all that she has and do all that she has done and still doing, but she knows she is right and that is way she should be.

"Mr & Mrs McGrew, it seam like one time that you went to two atty in Macomb, and of course it is just like this all they could see that money they could make off you, and they called Mrs. Woodcock, George Sprenger of Peoria, Illinois, and he talk to them and then they double cross him and went to state atty of Fulton County, and as you know there has been warrents out for you tow fine people. And I am trying to help you. Now Mr & Mrs McGrew, we haft to have the sum of $850, the sum that had to be gotten was $2500 and we have it all but that sum of $850 and then Mr & Mrs McGrew you can have your money, now I want you to help Mrs. Woodcock, for this has to be had by Monday night, Thanking you.

"Yours truly,
"Howard L. Doyle
"U. S. Dist Atty.
"Peoria, & Springfield, Illinois."

contents. However, at another point in her cross examination, she stated that "the messenger delivered letters to me that he (McGrew) would be picked up if he didn't pay so much money." This appears to contradict her denial of any knowledge of the contents of the letter set forth in the margin. Appellants contend that the letters were only admissible, if at all, as a part of the Government's case in chief. We agree with appellee that they were not admissible for that purpose, since they were not written until 1946, after the return of the indictment, but that they were admissible to impeach the testimony of appellant Woodcock as to her intent and good faith, and that they were properly admitted for the purpose.

We find no merit in appellants' motion for acquittal. The evidence amply sustains the charge of the indictment and the verdict of guilt.

Judgments affirmed.