**UNITED STATES of America**

v.

**Abraham A. BROWNE.**

**No. 11284.**

United States Court of Appeals
Seventh Circuit.

Aug. 17, 1955.

Frank W. Oliver, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., John Peter Lulinski, Asst. U. S. Atty., Chicago, Ill., Alexander O. Walter, Anna R. Lavin, Asst. U. S. Attys., Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and MAJOR and LINDLEY, Circuit Judges.

MAJOR, Circuit Judge.

Defendant, Abraham A. Browne, was jointly charged with Maxwell Riffkind (the latter under numerous aliases) in an indictment containing six counts, with the fraudulent use of the United States mails, in violation of Title 18 U.S.C.A. § 1341. The indictment alleged that defendants, pursuant to a scheme, defrauded or attempted to defraud certain enumerated insurance companies by making claims for losses which were fictitious. Such claims were presented by Riffkind, and in some instances the defendant Browne, a licensed and practicing attorney in the State of Illinois, was employed by Riffkind to conduct negotiations with the insurers with knowledge, so it was alleged, of their fraudulent nature.

In pursuance of the scheme, each of the six counts of the indictment alleged a separate and distinct use of the mails in the Northern District of Illinois. Riffkind entered a plea of guilty, Browne a plea of not guilty. The latter was tried by a jury and Riffkind was a witness for the government. The jury found Browne guilty on counts 2, 4, 5 and 6, and not guilty on count 1. The government at the conclusion of its case dismissed count 3. Counsel for Browne

appropriately moved for a directed verdict on the basis that the government's proof on all counts was insufficient to take the case to the jury. This motion, as well as the usual post-trial motions, was denied by the court and judgment was entered upon the verdict. Browne was sentenced to prison for terms of eighteen months on each of the four counts and fined $1,000. The judgment provided that the separate sentences were to be served concurrently.

From this judgment Browne (hereinafter sometimes referred to as the defendant) appeals. The confusing situation attending the presentment of the case here is shown by the contested issues as stated by the opposing parties. The defendant states the contested issues as follows:

"The trial court erred in denying defendant's motions for dismissal and for judgment of acquittal at the close of the government's case and at the close of all the evidence, because:

"a. There was no proof of venue as to Counts II and VI of the indictment.

"b. There was no proof of use of the mails as to Counts II and VI of the indictment.

"c. The government's evidence demonstrated that the defendant was not implicated in an unlawful transaction in Count IV of the indictment.

"d. The government's evidence demonstrated that no offense was committed or attempted as alleged in Count V of the indictment."

(Other issues are stated which need not be mentioned at this point.) The government states the contested issues as follows:

"1. Is there sufficient evidence in the record to support a charge of aiding and abetting under 18 U.S.C. 2 as against the defendant on appeal?

"2. As against the defendant on appeal, if he aided and abetted, then is it necessary to prove as to him all of the elements of venue and of the substantive offenses after confession of guilt by the principal defendant?"

Thus, the government does not take issue with defendant's contention that the proof was insufficient to take the case to the jury but attempts to excuse its failure to make proof, particularly as it relates to venue and use of the mails, on a theory that because defendant was an aider and abettor such proof was unnecessary, in view of the fact that Riffkind had entered a plea of guilty and testified as a government witness.

We shall first consider the situation as it relates to counts 2 and 6. Count 2 charged that the defendants caused to be delivered by mail at 175 West Jackson Boulevard, Chicago, Illinois, a letter addressed to the New York Casualty Company, 175 West Jackson Boulevard, Chicago 4, Illinois, Attn.: Mr. Gadwell, which had previously been placed in the mails for such delivery. A letter corresponding with that alleged in count 2, signed by A. A. Browne, was introduced by the government. Count 6 charged that the defendants caused to be delivered by mail at 170 West Jackson Boulevard, Chicago, Illinois, a letter addressed to the United States Fidelity and Guarantee Company, 170 West Jackson Boulevard, Chicago, Illinois, which letter had previously been placed in the mails for such delivery. The government in support of this count relies upon exhibit 5–A, which is not a letter, as alleged, but an accident report signed by Philip Goldberg, in or on which defendant's name does not appear. No stamped addressed envelope was introduced in support of the allegation that the exhibits relied upon in counts 2 or 6 were transmitted by mail.

The government, consistent with its statement of contested issues, after referring to Riffkind's plea of guilty

states, "All that is left is to tie up the defendant Browne into Riffkind's scheme," and "If the principal pleads guilty to the substantive offense, then all that need be proved against the aider and abettor, even though he be charged as a principal, is that the defendant consciously and knowingly aided and abetted." Three cases are cited in support of this argument: United States v. Klass, 3 Cir., 166 F.2d 373, 380; United States v. Carengella, 198 F.2d 3, 7–8, and United States v. Alexander, 219 F. 2d 225, 226–227. (The last two named decisions are by this court.) We think there is not in these or in any other case of which we are aware the slightest support for the government's theory. In fact, in the Klass case the court, in referring to the accessory statute, made the following statement, 166 F.2d at page 380:

> "It is not necessary that the actual principal be tried or convicted, nor is it material that the actual principal has been acquitted. [We think the court might also have added that it is immaterial that the principal has been convicted or entered a plea of guilty.] The aider and abettor may be charged with the substantive offense, and each participant must stand on his own two feet. [Citing cases.]"

We think the government's theory on this point is unsound. To countenance it would mean that one defendant by his admission of guilt, by plea of guilty or otherwise, could deprive any and all co-defendants of fundamental rights and privileges. To illustrate, the government claims that the letter set forth in count 2, purportedly signed by Browne (the same is true as to the exhibits described in some of the other counts), was mailed by Browne. Under the government's novel theory, it would appear that because of Riffkind's plea of guilty Browne was precluded from denying the authenticity of his signature to the letter (there is no proof that it was genuine), or that he wrote or mailed or caused to be mailed the letter as claimed. Nothing

would have been left to him by way of defense other than to deny that he was a party to the scheme alleged. His plea of not guilty would have raised no other issue.

■ However, if we indulge in the violent presumption that there is merit in the government's contention, it would be of no benefit on the instant record because it is not ascertainable that Browne was convicted as an aider and abettor. The government claims that he was because the court gave an instruction on that point which was not objected to by the defendant. We think that if Riffkind had been tried, the same instruction might appropriately have been given as to him. Both parties were charged as principals and Browne was convicted as such, and we think it is a *non sequitur* to assert that because the court gave such an instruction, Browne was convicted as an aider and abettor. Certainly there is nothing in the verdict of the jury by which that question can be resolved. More than that, it is quite doubtful whether Browne acted merely as an aider and abettor. It seems more reasonable to believe from the proof that his part in the scheme, if any, was that of a principal rather than an aider and abettor.

■ The government, notwithstanding its statement of contested issues, attempts on other grounds to justify its failure to meet the issue, that is, that it failed to prove venue and use of the mails. It argues that defendant waived venue "by going to trial on the merits" and by taking the stand in his own behalf. A number of cases are cited in support of this argument, including Hagner v. United States, 60 App.D.C. 335, 54 F.2d 446; Ladner v. United States, 5 Cir., 168 F.2d 771, 773; Rodd v. United States, 9 Cir., 165 F.2d 54, 56; United States v. Gallagher, 3 Cir., 183 F.2d 342, 346; United States v. Karavias, 170 F.2d 968; United States v. Jones, 174 F.2d 746, and United States v. Chiarelli, 192 F.2d 528 (the last three named decisions are by this court). None of these

cases support the contention. In Hagner, the indictment showed on its face that the court where the trial took place was without venue and it was held that the defendant waived venue by pleading and going to trial. In Ladner, the prosecution was for conspiracy and it was held that venue might be laid in any jurisdiction where an act of a co-conspirator took place. In Rodd, as in Hagner, the indictment did not allege venue in the jurisdiction where the trial took place and it was held that the defendant by going to trial on the merits without raising any question as to venue waived such defect. In Gallagher, the defendant entered a plea of guilty in a jurisdiction other than that alleged in the indictment. It was held that under Rule 20 of the Rules of Criminal Procedure, 18 U.S.C.A., this was permissible and that there was a waiver on the part of the defendant. In Karavias and Chiarelli, there was no issue as to waiver of venue. In each of those cases this court held that under the proof venue might be inferred. In Jones, there also was no issue as to the waiver of venue and the court held that venue could not be inferred from the circumstances in proof. In the instant situation admittedly venue was properly alleged. The point is that there was no proof of the allegation. Obviously, the defendant did not have knowledge at the time he went to trial that the government would fail to prove the allegation of the indictment with reference to venue. Such failure could not have been known to the defendant until the government had concluded its case. At that point the defendant, upon such failure on the part of the government was entitled to a directed verdict. This is a square holding by this court in United States v. Jones, 174 F.2d 746. See also United States v. Provoo, 2 Cir., 215 F.2d 531, 537.

■ It appears that the defendant made only a general motion for a directed verdict and the government asserts that proof of venue was waived by failure to specifically designate such failure as a basis for such verdict. Again, United States v. Jones has decided this question adversely to the government's contention. In doing so the court stated, 174 F.2d at page 748:

"The motion for a directed verdict raises the question as to the sufficiency of the evidence to support the verdict of a jury or finding of the court. One of the things the Government has the burden of proving is venue. It is an essential part of the Government's case. Without it, there can be no conviction. [Citing cases.]"

■■ The government, without calling our attention to any testimony and without any record citation, resorts to the stock argument that venue is shown when the record is considered as a whole. The courts in some cases have so held but in all such cases it will be found that there was proof of circumstances from which venue could be inferred. We doubt if it is the responsibility of a reviewing court, without any aid from the government, to search a voluminous record for a tidbit of evidence from which venue may be inferred. Furthermore, a reviewing court should not be expected to close its eyes to the record and surmise that after all venue could have been proven. As was stated in United States v. Johnson, 323 U.S. 273, 276, 65 S.Ct. 249, 251, 89 L.Ed. 236, "Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure." In discussing the issue of venue, the court in United States v. Jones, supra, stated, 174 F.2d at page 748: "It is an essential part of the government's case. Without it, there can be no conviction."

■ Use of the mails in the execution of a scheme, like venue, is an essential element which must be proved by competent evidence. As was stated in United States v. Berg, 3 Cir., 144 F.2d 173, 174:

"Though the formation of a scheme to defraud is essential, the gist of the offense charged in each count is the mailing of the letter

in furtherance of the scheme. That is the crux of the offense, and it must be proved by competent evidence."

And as stated by this court in Mackett v. United States, 90 F.2d 462, 464:

"That the use of the mail is the gist or corpus of the crime is so well established as to require no citation of authority, and must, of course, the same as other essential elements, be proven beyond a reasonable doubt."

See also Brady v. United States, 8 Cir., 24 F.2d 399, and United States v. Baker, 2 Cir., 50 F.2d 122.

■■■ The proof, if it can be dignified as such, which relates to both venue and use of the mails as alleged in counts 2 and 6, may be briefly stated. The false claim concerning which the letter in count 2 was alleged to have been mailed related to the case of Riffkind v. Goldberg. A number of exhibits, including 2–B (the count letter), were identified by the witness Gadwell and introduced in evidence. He testified that letters and other documents were received by a central office of the New York Casualty Company, where they were referred to a claim department and finally delivered to the person handling the particular claim. It was as a result of this procedure that exhibit 2–B came to his desk. He admitted that some of the exhibits pertaining to this claim were delivered to him personally by Browne. Our attention is called to no proof and we find none that the New York Casualty Company had an office in Chicago, or as to the location of its claim department or central office, or as to where Gadwell was located at the time the letter was delivered to his desk. There was no proof that the letter (2–B) was received by the witness or by any other person connected with the insurance company in a stamped addressed envelope. (This is a circumstance if shown, much relied upon by some of the cases as creating an inference that the letter was received through the mails.) It is true that Gad-

well at one point testified that the letter was received through the mails but it is conclusively demonstrated by his testimony that he had no knowledge that such was the fact and that his statement was nothing more than a matter of opinion. This was not sufficient. See Mackett v. United States, 7 Cir., 90 F.2d 462, 464, and cases therein cited. There was no competent proof either of venue or of use of the mails as alleged in this count.

As to count 6, the testimony relative to the issues under discussion is even more defective, if that be possible. In that count it was charged that a letter was delivered by mail to the United States Fidelity and Guaranty Company, 170 West Jackson Boulevard, Chicago, Illinois. No such letter as alleged was introduced but the government relies in support of this count upon exhibit 5–A, which is an accident report prepared by Riffkind. We think there is merit in defendant's contention that a conviction cannot be sustained on this count because of a variance between the allegation and the proof. However, we need not rely upon this discrepancy because there is no proof either as to venue or that the exhibit was received through the mails. Garr, a supervisor of personal injury claims for the United States Fidelity and Guaranty Company, testified that the accident report (exhibit 5–A) was placed on his desk and, when asked how it was received, testified:

"A. I would say it came in the mail * * *.

"The Court: The answer is yes or no.

"The Witness: I don't know.

"The Court: Oh, the answer is no, you don't know?

"The Witness: No."

Again no stamped addressed envelope was introduced in which the exhibit was or might have been received. The witness admitted that accident reports reach the company both by mail and by personal delivery. There is evidence that the home office of Fidelity was in Baltimore, Maryland, and that it had an office

in Chicago, but there is no proof that the accident report was received in the Chicago office. More than that, Riffkind, who prepared the report, testified as a witness for the government that he filed it with the insurance office, which militates against an inference that it was received through the mails. As to this count, the government's proof of venue and mailing is fatally defective.

 As previously shown by defendant's statement of contested issues, the attack upon the conviction under counts 4 and 5 is that the court erred in its refusal to direct a verdict because the proof was insufficient to implicate or connect Browne with the offenses therein charged. No question is made as to venue or proof of mailing as alleged in these counts. Count 4 charges that the defendants, for the purpose of executing the scheme to defraud as theretofore alleged, on or about July 20, 1949, "did mail and cause to be mailed at Chicago, Illinois, a letter addressed to Mr. A. Mazzoni, Potomac Insurance Company, 175 West Jackson Boulevard, Chicago, Illinois, to be sent and delivered by the Post Office Establishment of the United States." Count 5 alleges that the defendants, for the purpose of executing the scheme to defraud as theretofore alleged, did on or about July 29, 1949, cause to be delivered by mail a letter addressed to the same insurance company and at the same address as that alleged in count 4.

Both of these counts relate to claims made by reason of the asserted loss sustained by theft of certain fire arms insured by the Potomac Insurance Company. The claim relative to count 4 was in the amount of $1,500, predicated upon the loss by theft of an Italian Miquelet rifle purportedly of the value of $1,500. (This claim is sometimes referred to as the second gun loss.) The claim relative to count 5 was predicated upon the loss by theft of four guns stolen from Riffkind's car early in 1949. (This claim is sometimes referred to as the first gun loss.)

In examining the proof as it relates to these two counts, we assume that there was proof from which a jury could have found that Browne was a party to some of the schemes devised by Riffkind to defraud insurance companies. We indulge in this assumption notwithstanding that the proof against Browne is less convincing than the government would have us believe. No proof is called to our attention, and we find none, that Browne received any of the profits or money obtained by Riffkind as a result of his fraudulent conduct. In any event, it is not the scheme to defraud which the federal statute condemns but only the use of the mails in its execution. It is that use which constitutes the *corpus delicti* of the offense. It is, therefore, evident that each count constitutes a separate and distinct offense.

Even so, the facts and circumstances in proof which form the basis for the charges contained in counts 4 and 5 are so closely related that they may appropriately be considered together and, inasmuch as the original events relative to count 5 occurred prior to those concerned with count 4, we think it more logical to state first the facts as they pertain to count 5.

In January, 1949, Riffkind claimed that four guns were stolen from his automobile, occasioning a loss of $535. Riffkind reported this loss to the insurer which, after an investigation, replaced the guns at a cost of $535. The draft drawn for this purpose was dated March 21, 1949.

On July 20, 1949, Riffkind filed a claim against the same insurer for $1,500, purporting to be the value of an Italian Miquelet rifle. Claim for this loss by a letter prepared by one Singer (the alleged insured) was presented to the insurer by Riffkind, although it had previously been reported by telephone by one Gaston. Upon investigation by the insurer, it was ascertained that Riffkind and Gaston were one and the same person and that the claim was fraudulent. Riffkind, under the name of Gaston, on

July 23, 1949, signed a statement that the claim for loss was a mistake and released the insurer from all claims in connection therewith. Nothing was paid by the insurer on this false claim.

Riffkind, on the same date that he released the insurer, made an appointment with Browne by telephone. Browne, a day or two later during a personal meeting with Riffkind, was informed that the claim for the second gun loss was fraudulent and that the insurer was suspicious of the first gun loss. Riffkind also requested Browne to see the insurer and find out what it was all about. Browne went to the office of the insurer on July 26, 1949. There is no proof that he had any connection with either the first or second gun loss prior to that time. Two of the insurer's employees, Reid and Mazzone, testified as to the conversation with Browne on the occasion of his visit to the insurer's office.

We assume that the government has stated the facts relative to count 5 in the light most favorable to it and that we can do no better than reiterate the facts so stated. "The record makes it clear that there was, in fact, a theft and further, that a claim could legitimately have been made of the insurer. The taint upon the transaction was occasioned by the irresistible propensities of Riffkind, whose past deviations apparently caused him to color this otherwise valid one. He lost three guns and claimed and received replacement of four. He then sold the guns for $250. Subsequently, the insurer summoned Riffkind in to discuss the claim, and Riffkind contacted Browne to 'go down and see what they want.' Browne went to see the witness Mazzone, who took him to the office of the witness Reid. Mr. Reid informed Browne that their investigation indicated that the insurer should be reimbursed in the amount expended in the replacement of the guns [first gun loss]. Browne offered a compromise of $250 or $200. The conversation was concluded without accomplishment and two or three days later Browne wrote the count letter [dated July 28,

1949] (Exhibit 3–C)," which read as follows:

"Gentlemen:

"Relative to the matter of Maxwell Riffkind, please be advised that after an examination of all the facts and conferences with certain individuals involved in this matter I have come to the conclusion that, in my opinion, Maxwell Riffkind did not perpetrate any frauds upon your insurance company, and further that the loss sustained by him in the first instance six months ago was a bona fide and legitimate loss and if any irregularities has existed, may I suggest that you investigate the transactions of the gun seller and certain other individuals in this matter.

"Therefore under the circumstances I am advising Mr. Maxwell Riffkind to stand by his guns and will even stand further investigation.

"Very truly yours,
"[Signed] A. A. Browne"

Riffkind as a witness for the government testified that all his conversations with Browne about this claim (first gun loss) were to the effect that it was legitimate, and there is no proof that Browne had knowledge or reason to think that this loss was other than authentic until his interview with the agents of the insurer. Even at that time the latter did not state that the claim or any portion of it was fraudulent. At the most it appears that the insurer had become suspicious of this first loss because of its discovery of fraud in connection with the second loss, and that Browne had suggested that Riffkind reimburse the insurer to the extent of the amount which Riffkind had received for the guns replaced by the insurer. Browne, relying upon the information furnished him by his client, Riffkind, that the first gun loss was legitimate (admitted by the government to have been legitimate in part), wrote the count letter dated July

28, 1949. The letter speaks for itself but it should be noted that it refers only to the first gun loss, about which he was interviewed by the insurer's agents. In our view, it does not afford the slightest support to the charge that it constituted a use of the mails to obtain money pursuant to a scheme to defraud.

It is feebly suggested by the government that even though the money alleged to have been fraudulently obtained by Riffkind had been paid to him many months before, Browne's letter was of the "typical lulling variety, patently calculated to stem inquiry into the fraud, to deflect further investigation in the direction of strangers," and that as such it aided in the furtherance of the scheme. United States v. Bowcott, 7 Cir., 170 F. 2d 173, is cited in support of this argument. There is no similarity, however, between the facts of that case and those here. If this letter can be properly characterized as of the "lulling" variety, it would seem that any letter written by an attorney concerning a controverted claim would fall in the same category. It is too much to believe that an insurance company with all of its experience and means for investigating claims and detecting fraud can be so easily put off guard, and it cannot be reasonably inferred from the letter or other proof that Browne's letter was intended for or that he expected such a result. There should have been a directed verdict as to this count.

The facts relied upon as a basis for the charge contained in count 4 have partly been related. The fraudulent claim admitted to have been such was presented to the insurer by Riffkind in a letter dated July 20, 1949. It was after that time, as well as subsequent to the discovery of the fraudulent nature of the claim by the insurer, that Browne was shown to have had any knowledge concerning it. There is proof that he had knowledge of its falsity prior to his interview with the insurer's agents at its office on July 23, 1949, as heretofore related. With reference to that visit, the government in its brief states: "Browne went to the company and saw Mr. Mazzone and Mr. Reid. He told them that so long as the company had not paid out on the claim, it had lost no money, so he felt that Riffkind owed it nothing." This is the only proof relied upon by the government to connect Browne with the offense charged in this count. A reading of the testimony of the witnesses Reid and Mazzone makes it plain, however, that the major portion of their conversation with Browne related to the first gun loss, and that the second loss was referred to only incidentally and that during such reference Browne made the statement above quoted. It is not discernible how that statement made after the fraudulent claim had been submitted and subsequent to the time of the discovery of the fraud by the insurer furnishes any support for the charge that Browne used or caused the mails to be used in the execution of a fraudulent scheme. Assuming that Browne had knowledge of the fraudulent claim, and there is proof that he did, and that he went to the office of the insurer for the purpose of discussing such claim (the proof shows that he did not but that the same was mentioned only incidentally), we would still doubt if the proof was sufficient to connect Browne with the offense charged. He committed no act relative to the fraudulent presentation of the claim and made no statement with reference to it other than to express the opinion that Riffkind owed nothing because the claim had not been paid.

The record reveals that the trial court was skeptical concerning the propriety of admitting exhibit 4–C (the fourth count exhibit). At the time this exhibit was first offered (together with other exhibits), the court on defendant's objection stated to government counsel, "You will admit that as to the letters that are offered, the exhibits do not tie in the defendant?" to which government counsel replied, "I will have to admit that much." The court sustained the objection, with the statement that counsel might renew the offer at the close of the government's case. Later

in the trial and while Riffkind was on the witness stand, exhibit 4–C was again offered. On objection, government's counsel stated, "We will tie them up." The court admitted the exhibits, including 4–C, "on the assurance of the United States Attorney that there will be something to indicate that the exhibits go to prove some of the issues here in this case." Notwithstanding the basis, however, on which exhibit 4–C was admitted, there was no further testimony by the government which connected the exhibit with Browne. In fact, the only testimony which followed the admission of the exhibit under the circumstances related was the cross-examination of the witness Riffkind, who completely exonerated Browne of having any knowledge of fraud with reference to the first gun loss and likewise exonerated him from being a party to the attempt to defraud the insurer as to the second gun loss. We think that exhibit 4–C should not have been admitted but that in any event the proof was insufficient to justify a conviction.

Other issues have been raised which we find unnecessary to relate or discuss. It is our judgment that the government's proof was insufficient, for the reasons stated, to take the case to the jury on any of the four counts. The judgment of conviction as to each count is, therefore,

Reversed.

LINDLEY, Circuit Judge, dissenting.

I regret that I cannot accede to the decision of my brethren. I have read all of an extended record. It reflects duplicity on the part of defendant Browne and the witness Maxwell Riffkind, which, for brazen effrontery and depravity and for daring repeated frauds I have seldom seen equalled. I shall not attempt to epitomize the evidence but to me it conclusively ties Browne in with a scheme to defraud continuing over a period of years. Time after time, Riff-

kind testified, Browne conceived and engineered the barefaced attempts (usually successful), to defraud insurance and casualty companies and airlines. Indeed, in one instance, according to this witness, Browne suggested to Riffkind, after damage to the latter's truck, that he proceed at once to obtain a policy of insurance which would cover the damages already incurred. The advice was followed and the fraud consummated. Other equally flagrant instances are far from rare. It seems to me that no one can read this sordid story of a faithless lawyer and escape the conviction of his guilty participation in fraudulent machinations having as their sole purpose the obtaining of money by false pretensions. Being an active participant in this evil undertaking, Browne cannot escape the acts and statements of his co-conspirator in promotion of the conspiracy during its actual existence.

I am convinced likewise that whether there was use of the mails in promotion of this undertaking as charged in the indictment was a question for the jury. The office manager testified as to the receipt of the letters charged in Count II and explained in detail how incoming mail was handled. As to Count VI the person in charge explained in detail the receipt of the mail. All parties lived in Chicago. All transactions occurred there. Ample testimony as to the use of the mails appeared in the record. I think the evidence as to mailing within the district was of such character as to justify the jury's verdict of guilty of use of the mails in furtherance of the fraudulent scheme.

I think also that the evidence as to the other counts, viewed in its light most favorable to the Government, required submission to the jury. At any rate the sentence was justified by a verdict of guilty upon any one count. Other points argued by defendant were not raised below. I would affirm the conviction.